(No. 64721.
CINDY R. TROWER *et al.*, Appellees, v. GRANT A. JONES, M.D., Appellant.

*Opinion filed January 19, 1988.—Rehearing denied April 5, 1988.*

212

RYAN, J., took no part.

Richard F. Record, Jr., and Paul R. Lynch, of Craig & Craig, of Mattoon, for appellant.

Gregory E. Pelini, of Pelini & Sheffler, and Heidi J. Dresch, law student, all of Champaign, for appellees.

David A. Novoselsky and Kathryn A. Bettasso, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Robert W. Neirynck, of Costigan & Wollrab, P.C., of Bloomington, for *amicus curiae* Illinois Association of Defense Trial Counsel.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In the circuit court of Douglas County, plaintiffs, Cindy R. Connour (now Cindy R. Trower) and Donald E. Connour, filed a two-count complaint against defendant, Grant A. Jones, M.D. In count I, Cindy Trower alleged that she suffered personal injuries as a result of defendant's negligence in the care and treatment of her condition. In count II, Donald E. Connour alleged that he suffered a loss of society as a result of the same negligent acts of defendant. The jury returned verdicts in favor of

defendant, and the court entered judgment on the verdicts. Finding that the circuit court had erroneously permitted defendant to impeach plaintiffs' expert by inquiry into (1) the frequency with which he testifies for plaintiffs rather than defendants, and (2) the annual income derived from services related to testifying as an expert witness, the appellate court reversed the judgment of the circuit court and remanded for a new trial. (149 Ill. App. 3d 705.) Pursuant to Supreme Court Rule 315 (107 Ill. 2d R. 315), we granted defendant's petition for leave to appeal.

The trial testimony is set forth in detail in the appellate court's opinion and will be repeated here only to the extent necessary for a discussion of the issues here presented. Plaintiffs called Dr. James K. Martins as their expert witness. His testimony during direct examination included a discussion of his education, his experience as a physician, and other credentials. He also explained how he became involved in this case. He stated that he was a "fellow" of the American Board of Medical Legal Consultants (Board) and that the Board had asked him to review the case. He described the Board as "a group of medical legal consultants that attempt to determine whether lack of standard of care, injuries, or malpractice has occurred in a variety of cases." He explained that when the Board sends him a medical file to review, the file comes with a check, the amount of which depends upon how voluminous the file is.

On cross-examination, Dr. Martins acknowledged that the Board is a for-profit organization and that its purpose is to review cases involving suspected malpractice and to furnish expert testimony. Dr. Martins further acknowledged that most of the Board's cases are obtained through attorneys. He further stated that 80% of his professional time is devoted to work for the Board. He stated that since 1983, when he began working for the

Board, he had reviewed over 700 cases for the Board, had given depositions in approximately 60 of those cases and had given expert trial testimony in approximately 30 of those cases. He acknowledged that these trials had encompassed over a dozen States throughout the country, and had involved matters as diverse as alleged inadequate neurological examination, osteomyelitis (an infection in bone), septicemia following a cortisone injection, and alleged failure to diagnose a brain tumor. Over objection, he was asked the following question regarding the approximately 30 trials in which he has given expert testimony: "All of these cases have been for plaintiffs, or that is people suing doctors?" Dr. Martins responded, "Of the majority, yes." Also over objection, Dr. Martins was asked the following question regarding his work for the Board: "In [1983] your income from this type of work was $29,000 approximately?" Dr. Martins answered affirmatively. On further questioning he also acknowledged (over objection) that in 1984 his income from such work was $44,000.

Defendant and *amicus curiae* Illinois Association of Defense Trial Counsel contend that it was within the discretion of the circuit court to permit inquiry into both the frequency with which Dr. Martins testifies for a particular class of party, *i.e.*, plaintiffs, and the amount of annual income derived from testifying as an expert witness. They argue that the appellate court failed to recognize the discretion vested in the circuit court. They note that the appellate court apparently found the questions *per se* inadmissible. Plaintiffs and *amicus curiae* Illinois Trial Lawyers Association do not refute that the appellate court found the questions *per se* inadmissible. However, they contend that the appellate court's decision is fully supported both by precedent and sound policy considerations.

Many years ago this court indicated, in *McMahon v. Chicago City Ry. Co.* (1909), 239 Ill. 334, that an expert witness should not be questioned with regard to the number of occasions on which he has previously testified for a given category of party (such as plaintiffs or defendants). Specifically, *McMahon* held that it was error (though harmless) to permit a plaintiff (injured in a collision with a train) to ask a defendant's expert medical witness how many times he had testified on behalf of the various streetcar lines of Chicago. Several early decisions of this court also arguably indicate that an expert should not be questioned regarding compensation received for testifying in cases unrelated to the parties or their attorneys. (See, *e.g.*, *Chicago City Ry. Co. v. Smith* (1907), 226 Ill. 178; *Chicago & Eastern R.R. Co. v. Schmitz* (1904), 211 Ill. 446.) In each of these several cases, however, the court held only that the circuit court did not abuse its discretion in excluding such evidence; the cases do not necessarily indicate that such evidence is always inadmissible.

Since these cited Illinois cases were decided many years ago, both the difficulty and paramount importance of thorough, comprehensive cross-examination of experts have increased markedly. Cross-examination has been made more difficult in part by the increased latitude given experts when rendering their opinions. For example, in *Wilson v. Clark* (1981), 84 Ill. 2d 186, this court adopted Rules 703 and 705 of the Federal Rules of Evidence (Fed. R. Evid. 703, 705) with respect to expert testimony. Accordingly, experts can now render opinions without prior disclosure of the underlying facts or data upon which those opinions are based. Further, experts can now render opinions based upon certain inadmissible evidence (if such evidence is reasonably relied upon by experts in the field in forming opinions upon the subject). Although we view this expansion as prudent, we do

recognize the added burden which these changes place upon a party during cross-examination in attempting to discredit his opponent's expert, and we also recognize that these changes heighten the importance of such cross-examination. Adding to the importance of effective cross-examination is the proliferation of expert "locator" services which, as a practical matter, can help the litigants of either side of most any case find an expert who will help advocate the desired position. As this case helps illustrate, many experts today spend so much of their time testifying throughout the country that they might be deemed not only experts in their field but also experts in the art of being a persuasive witness and in the art of handling cross-examination. As was stated in *Kemeny v. Skorch* (1959), 22 Ill. App. 2d 160, little has the nonlitigating public (including the jury) realized "the true rhetorical masterpieces that came from the lips of medical experts." 22 Ill. App. 2d at 171.

The combined effect of both the greater latitude given expert witnesses during direct examination and the expertise of many expert witnesses as expert witnesses is aptly set forth by Professor Michael H. Graham as follows:

> "In combating testimony of the expert witness, opposing counsel must rely upon his skill in probing at weaknesses in the basis and reasoning of the witness whether or not disclosed upon direct, without letting the witness reinforce his direct testimony in the process. He must do this with an expert witness more familiar with the subject matter. Of course, counsel also has available the use of learned treatises to assist him in fencing with the witness. Unfortunately fencing with the witness is the impression the cross-examination of an expert witness often leaves with the jury, an impression trial counsel would prefer to avoid. The difficulty in conducting a successful destructive cross-examination is compounded by the growing number of experts whose livelihood is dependent

in large part upon the litigation process. Such experts with their vast amount of litigation experience become exceptionally proficient in the art of expert witness advocacy." Graham, *Impeaching the Professional Expert Witness by Showing of Financial Interest*, 53 Ind. L.J. 35, 40 (1977).

We have long recognized that the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship or financial interest. (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 407; *Chicago City Ry. Co. v. Handy* (1904), 208 Ill. 81.) The considerations discussed above further illuminate the ever-increasing importance of bringing to the jury's attention facts by which the jury may reasonably discount the credibility of an expert's testimony.

It is with this recognition of the important role of cross-examination that we view plaintiffs' arguments. We first focus on their arguments regarding inquiry into the expert's annual income from serving as an expert witness. Plaintiffs argue that evidence of an expert's financial interest in the case should be limited to the remuneration received for testifying (1) in a particular case, (2) for a particular party, or (3) for a particular party's attorney. They point to cases in which we have allowed such inquiries (see, *e.g.*, *Sears v. Rutishauser* (1984), 102 Ill. 2d 402; *Chicago City Ry. Co. v. Handy* (1904), 208 Ill. 81), and argue that such cases prescribe the limits of such a line of inquiry. They contend that an extension of these cases would bring before the jury information which is of only minimal probative value and which is confusing and highly inflammatory. Defendant responds that this case is analogous to *Sears*. He contends that no pertinent distinction can be drawn between allowing an expert to be cross-examined regarding other employment by an attorney for a party (as was

allowed in *Sears*) and allowing an expert to testify regarding other employment by the witness referral service through which he became involved in the instant case.

We believe that the questions regarding Dr. Martins' income which are at issue here were permissible, and we do not base our conclusion on the strict analogy to the facts in *Sears* suggested by defendant. Rather, we reach our decision based on an appreciation of the fact that the financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case. A favorable verdict may well help him establish a "track record" which, to a professional witness, can be all-important in determining not only the frequency with which he is asked to testify but also the price which he can demand for such testimony. We find pertinent the following commentary from a recent annotation:

> "That an expert in a particular field may be in effect a 'professional witness' in lawsuits, rather than being more or less exclusively a practitioner whose employment in a lawsuit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality." (39 A.L.R.4th 742, 746 (1985).)

We thus find that it was proper to inquire how much Dr. Martins was earning annually from services relating to rendering expert testimony, and we find no impropriety in inquiring into such income for the two years immediately preceding trial.

Plaintiff contends that by permitting opposing counsel to cross-examine an expert regarding his annual income from working as an expert witness, we will be injecting into trials extensive testimony regarding collateral issues. Plaintiffs contend that when an expert is cross-examined regarding his annual income from testifying, the party presenting the expert witness will then be compelled to present extensive evidence as to the reasonableness of the fees charged. We recognize that when evidence of a particular matter is introduced, and a party will be unfairly prejudiced if not given the opportunity to respond to such testimony, generally a response must be permitted. (See, *e.g.*, *Norton v. Clark* (1912), 253 Ill. 557; *O'Rourke v. Sproul* (1909), 241 Ill. 576.) However, we are not convinced that testimony regarding an expert witness' income from serving as an expert witness will necessitate a lengthy and detailed "rehabilitation." Evidence that a witness makes substantial income from testifying does not necessarily imply that his fees are unreasonable, but such evidence does illuminate the financial interest the expert has in giving such testimony. We think that an explanation by the witness as to how he determines his fees (such as with regard to fees charged by his colleagues for rendering testimony in similar matters) should be sufficient in most situations to avoid unfair prejudice. An evaluation of the extent to which such rehabilitation testimony should be permitted must be left largely to the circuit court to decide on a case-by-case basis, weighing both the need to explain the reasonableness of the fees as well as the need to avoid confusion of issues and undue delay of the trial. Moreover, recognizing the impracticability of permitting extensive testimony and counter-testimony regarding the reasonableness of an expert's income from trial-related work, we nevertheless find it preferable to introduce evidence of income from such matters and limit a discus-

sion as to its reasonableness than to withhold from the jury the knowledge that the witness derives substantial income annually by serving as an expert witness.

We also find that the circuit court properly permitted counsel to inquire, on cross-examination, as to the frequency with which Dr. Martins testifies for plaintiffs. Such information clearly has some relevance in determining whether an expert witness is biased or his opinion skewed. Attorneys, judges and many trial experts themselves are well aware that certain expert witnesses appear particularly willing to testify that medical negligence has occurred, while others appear particularly inclined to testify that there was no deviation from the appropriate standard of care. Obviously, the fact that a physician testifies only for one category does not necessarily mean that his testimony is not credible. For example, a physician may adopt a policy of testifying only on behalf of other physicians in order to avoid the resentment among his colleagues which could arise from testifying on behalf of individuals suing physicians. This would not mean that he testifies on behalf of doctors who he believes were actually negligent, but only that (for personal reasons) he prefers not to testify for plaintiffs regardless of the merits of their case. A reasonable jury can be expected to recognize the possibility that the expert witness has just such a legitimate concern, and the counsel presenting the witness may even wish to point out such a possibility to the jury. Nevertheless, information as to whether a particular expert routinely testifies for a particular category of party is certainly of some value in determining whether he may have a predisposition either to exculpate or find fault. There is no sufficient reason why this information cannot be weighed and evaluated by the jury along with all of the other evidence pertaining to the credibility of an expert witness.

Plaintiffs contend that if we permit evidence regarding a tendency to testify for a particular category of party, we must then permit the party presenting the witness to introduce evidence that the witness' testimony in the other cases was fully supportable. Plaintiffs even speculate that testimony of additional experts will be necessary in order to establish that the former testimony of the expert whose credibility is at issue is supportable. Plaintiffs assert that the result will be a whole series of subtrials, in which the merits of unrelated cases are addressed. However, we believe that fairness does not dictate that from this single question should spring such broad inquiries into the merits of former cases. As previously stated, we are confident in the jury's ability to recognize that the fact that a witness has typically testified for a category of party does not mean that his testimony in the previous cases was ill-founded. An explanation by the witness (the extent of which is properly left to the circuit court's discretion) regarding why he has an apparent tendency to testify for one category of party should allow the jury to view his tendency in the proper perspective. Of course, absent any explanation by the witness, a jury is likely to conclude, and not without justification, that the witness may have some favoritism toward a particular category of party.

Plaintiffs also speculate that by permitting on cross-examination the two inquiries at issue in this appeal, we will be making the pretrial discovery process extremely and unnecessarily burdensome. Plaintiffs also posit that we will be creating tremendous conflicts between a party's right to discover evidence needed for impeachment or rehabilitation, and evidentiary privileges (in particular, the physician-plaintiff privilege). By our holding in this case we do not intend to create any additional exceptions to any evidentiary privileges, nor do we intend

to alter the authority granted to the circuit court to oversee and limit the discovery process.

In summary, for the reasons herein indicated, we hold that the circuit court did not abuse its discretion in permitting defense counsel, during cross-examination of plaintiffs' expert witness, to inquire regarding (1) the annual income derived from services relating to serving as an expert witness and (2) the frequency with which the witness' testimony in prior cases had been for "people suing doctors." To the extent that *McMahon v. Chicago City Ry. Co.* (1909), 239 Ill. 334, *Chicago City Ry. Co. v. Smith* (1907), 226 Ill. 178, and *Chicago & Eastern R.R. Co. v. Schmitz* (1904), 211 Ill. 446, are inconsistent with this holding, those cases are overruled.

The judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE RYAN took no part in the consideration or decision of this case.