SIXTH DIVISION
December 1, 2006

No. 1-04-1079

| | | |
|---|---|---|
| MATTHEW SHAHEEN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| ADVANTAGE MOVING AND STORAGE, INC., and | ) | |
| WILLIAM T. URBAN, | ) | Honorable |
| | ) | Martin S. Agran, |
| Defendants-Appellants. | ) | Judge Presiding |

JUSTICE McNULTY delivered the opinion of the court:

A moving van struck Matthew Shaheen as he crossed a street. Shaheen sued the van's owner and its driver. A jury found all parties negligent and assessed damages. The trial court entered judgment in favor of Shaheen on the verdict, with the award reduced due to the finding of contributory negligence.

On appeal defendants argue that the trial court should have entered judgment in their favor notwithstanding the verdict or the court should have reduced the damages awarded. Defendants also argue that the court committed several errors warranting a new trial. We publish this as an opinion to discuss defendants' argument that the court should not have permitted plaintiff to rehabilitate his doctor with evidence that the attorney for defendants had consulted with that doctor in other cases. Other issues include the propriety of jury instructions and the sanctions imposed for a discovery violation, the admissibility of expert testimony projecting plaintiff's potential earnings, and

improper remarks in closing argument.  We find no grounds for disturbing the judgment.

## BACKGROUND

Around 8 p.m. on October 27, 2000, Shaheen and his friend Eric Johnston walked north on the west side of Wabash Avenue in Chicago.  William Urban, working for Advantage Moving & Storage, drove west on Huron Street in the lane closer to the north side of the street, coming to a stop sign at Wabash Avenue.  The van hit Shaheen near the intersection.  A moment before impact Johnston yelled to Shaheen and Urban's passenger yelled to Urban, but both warnings came too late.  The impact fractured bones in Shaheen's leg, pelvis and back.

Shaheen returned to work about seven weeks after the accident.  He reduced his schedule to six hours a day, on his doctor's advice.  In 1999, the year before the accident, Shaheen earned $56,682 from his work as an attorney.  For 2001 Shaheen reported earnings, mostly from the same employer, of just under $60,000.

In December 2000 Shaheen sued Advantage and Urban for negligence.  Defendants took the deposition of Dr. Samuel Chmell, one of plaintiff's treating physicians, in November 2002.  At that point Dr. Chmell had not seen plaintiff since September 2001.  Dr. Chmell testified that he had no opinion "as to whether

[plaintiff] will require or not require surgery for what is his now healed *** fracture" of the hip joint. Dr. Chmell added that he had recommended further tests, including a CAT scan of the pelvis and back, but as of the deposition, he had no additional data, and no indication plaintiff had undergone the recommended tests.

According to Dr. Chmell, the hip fracture increased the risk plaintiff would develop arthritis at that joint. Dr. Chmell agreed that "any other opinions regarding arthritis would be speculative unless [he] had more information." He testified that the accident permanently injured plaintiff's back. In Dr. Chmell's opinion plaintiff would continue to experience pain and stiffness in his back, and he would continue to have difficulty walking. The back problems would require regular medical treatment.

On July 17, 2003, plaintiff served on defendants amended answers to defendants' interrogatories concerning the testimony plaintiff expected to elicit at trial. Plaintiff said that Dr. Chmell would testify concerning the permanence of the injuries and the need for future medical care, including the possible need for surgery. Plaintiff added that Dr. Chmell's testimony would accord with his deposition, along with "his medical records, the medical records of other medical providers, radiological films

1-04-1079

and his report dated June 28, 2003." Defendants obtained Dr. Chmell's complete medical reports a few weeks later. The records showed that Dr. Chmell examined plaintiff in May 2003. Defendants sought no further discovery concerning the May examination.

The parties took Dr. Chmell's evidence deposition, for use at trial, on September 16, 2003, two months after plaintiff amended his answers to interrogatories. Dr. Chmell described his examinations of plaintiff just as he described them in the discovery deposition. Plaintiff's attorney showed Dr. Chmell a CAT scan of plaintiff's pelvis. Defendants objected that plaintiff failed to disclose any opinions related to the CAT scan. Dr. Chmell interpreted the CAT scan.

Defendants objected to all testimony related to the May examination. Dr. Chmell testified that in that examination he found plaintiff still suffering from low back pain and leg pain, especially when he attempted repair work on the apartment buildings he managed. In Dr. Chmell's opinion the accident in 2000 caused the continuing difficulties. Dr. Chmell testified about the permanent injuries and the likely degeneration of plaintiff's back. He believed that the hip might degenerate so far as to need surgery. Defendants objected that the testimony concerning hip surgery conflicted with testimony from the

1-04-1079

discovery deposition.

On cross-examination Dr. Chmell admitted that he earned about 10% of his income from evaluating patients in preparation for trials. He intended to bill plaintiff's attorneys for his time spent on the case.

Plaintiff's attorneys on redirect asked Dr. Chmell further questions about his forensic work:

"Q. *** [H]ave you had occasion in the past to be retained by the defense firm, by the attorneys within the defense firm in this case?

A. Yes.

* * *

Q. Is the amount that you charge, Dr. Chmell, the $500 an hour the same amount that you charged the defense firm in this case when you gave your discovery deposition?

A. Yes."

Before trial defendants sought rulings on the objections raised at the evidence deposition. The trial court struck the testimony related to the CAT scan and all allusions to the possibility of hip surgery. In regard to the testimony about the May examination, the court asked defense counsel:

"THE COURT: *** And then you subpoenaed all the

[medical] records.  When did you receive those records?

MR. HAYNES [Defense counsel]:  Probably within ***
two to three weeks after we did it.

THE COURT:  So what did you do between that time
and today's date *** -- did you go into court and ask
to either have it barred or supplement the record?

MR. HAYNES:  We didn't ***.  I mean, how many
times do we have to keep doing this?"

The court considered defendants' diligence and surprise,
plaintiff's good faith, and the prejudicial effect of the
testimony.  The court said:

"[T]rial was set for September 16, so it's not like
this was filed and you got a couple of days till
trial's going.

*** I mean, you sat on it ***.  *** [Y]ou could
have at that time gone in and asked that this testimony
be barred and *** that the discovery date be enforced
or that would have given you sufficient time in order
to *** take supplementary discovery ***.

* * *

*** [I]t's not really a surprise because it's two
months ago that this occurred ***.  *** [T]here was
plenty of time to act ***.

* * *

*** [Y]ou had an opportunity to address this long before today's date, and *** going over the factors, I don't think they weigh in your favor. As such, this particular motion will be denied."

The court also overruled the objection to Dr. Chmell's testimony that he worked for defendants' attorneys in other cases.

At trial plaintiff's psychiatrist testified that plaintiff suffered from post-concussive syndrome. The psychiatrist explained that in the accident plaintiff suffered a traumatic brain injury that caused him ongoing anxiety, headaches, nausea and fatigue. Plaintiff had difficulty with memory and concentration, and he did not fall asleep easily. The psychiatrist treated plaintiff's symptoms with several medications. In the psychiatrist's opinion the post-concussive syndrome would continue to affect plaintiff permanently.

Plaintiff's psychologist confirmed that plaintiff had suffered a mild traumatic brain injury that caused "reduced mental sharpness, less ability to focus attention and sustain attention, reduced ability to keep track of many things at one time, [and] reduced speed of problem solving." Plaintiff also stopped bicycling and canoeing due to the pain.

Several of plaintiff's friends testified about changes in his personality following the accident. He became insecure, inflexible and anxious, getting flustered easily. He changed from an engaging, outgoing person to a reticent, quiet person who no longer attempted much intelligent conversation.

An accountant who wrote articles on estimating work life expectancy testified that before the accident plaintiff had a work life expectancy of 27.7 years. The current disabilities reduced plaintiff's work life expectancy to 24.2 years.

Dr. Anthony Gamboa, a vocational counselor, testified that he assessed plaintiff's work disability. Dr. Gamboa relied on plaintiff's age, education, work history and earnings history, along with his interview of plaintiff, to reach the conclusion that plaintiff suffered from a nonsevere work disability that reduced his organizational skills, memory, and problem-solving ability, while leaving plaintiff more fatigued. Using government data for the broad spectrum of nonsevere work disabilities, he estimated that the disability reduced plaintiff's earning capacity such that if he had no disability he could earn 31% more than his current income. Dr. Gamboa used the 31% figure and plaintiff's projected work life to estimate plaintiff's lifetime loss from diminished earning capacity as $885,300. The statistics Dr. Gamboa used did not distinguish earnings reduction

by occupation, so he did not use any data peculiar to plaintiff's education and occupation as an attorney.

Plaintiff and Johnston testified that plaintiff crossed Huron at Wabash in the crosswalk. Nothing blocked Urban's view of plaintiff. Neither plaintiff nor Johnston heard a horn sound. The van knocked plaintiff 15 feet through the air. Plaintiff tried to get up but found he could not move. Before the accident plaintiff enjoyed bicycling, walking and other outdoor activities.

Urban testified that when his passenger yelled, he saw plaintiff walking in the street between parked cars. After the impact Urban watched plaintiff get up and walk 15 feet back toward the intersection before lying down in the street.

An expert testified for the defense that plaintiff did not suffer from any permanent disability. Another expert testified that no physical condition explained the pain plaintiff claimed he continued to feel. The expert found no connection between the accident and plaintiff's present complaints.

In closing plaintiff attacked Urban's testimony that he saw plaintiff step into the street midblock, coming from between parked cars and crossing another lane of traffic before the van hit him.

"I think *** he never saw him. I have no doubt in my

mind that if he had seen him, that Mr. Urban would have
done whatever he could to avoid doing this."

The court sustained defendants' objection to what the attorney believed Urban would do. The court sustained another objection to plaintiff's comment that "the same kind of defense was used" in a different case.

One treating physician did not testify. Defendants argued that plaintiff presented Dr. Chmell rather than the other physician because Dr. Chmell's opinions better supported plaintiff's case. Plaintiff answered in rebuttal:

"[I]f [the other treating physician] had something
different to say, with all of the resources that are
being brought in this case, don't you think they would
have brought him in to say it[?]"

Again, the court sustained defendants' prompt objection.

Plaintiff's counsel later discussed the defense strategy:
"Now, [defense counsel] keeps talking about Mr. Urban.
There's two defendants in this case, his employer.
[Defense counsel] told you that [Urban] was working at
the time. So why does he keep doing that? *** He's
trying to make you have undue sympathy. ***

*** Why isn't he talking about -- we don't even
know -- it's different people all the time who [sit]

-10-

here on behalf of Advantage."

The court sustained defendants' prompt objection and instructed the jury to disregard the comment.

Plaintiff's counsel discussed the possibility jurors might not sympathize with his client:

"[Y]ou might think, *** [']I don't like the things that Matt likes.['] *** You might think[, ']I hate fraternities.['] Well, you have to walk that journey with Matt if you're going to do justice in this case."

Again, the court sustained a prompt objection and instructed the jury to disregard the remark.

Finally, plaintiff's counsel commented, "We did not choose in this case to hire expert witnesses to come in here and put *** the facts in the light most favorable to Matt." The court overruled defendants' objection. Plaintiff's counsel then clarified that he preferred to use only treating physicians for testimony about plaintiff's injuries.

Over defendants' objection the court instructed the jury:

"Every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding horn when necessary.

* * *

The plaintiff claims *** that the defendants were

1-04-1079

negligent in [that they] *** failed to sound proper
warning to prevent an accident ***.

* * *

If you decide for the plaintiff on the question of
liability, you must then fix the amount of money which
will reasonably and fairly compensate him for *** loss
of a normal life experienced and reasonably certain to
be experienced in the future as a result of the
injuries."

The jury found both plaintiff and Urban negligent, with
plaintiff contributing 20% of the negligence that caused the
accident. The jury found that the accident caused plaintiff
$955,000 in total damages, which the jury itemized as $140,000
for pain and suffering, $500,000 for loss of a normal life,
$200,000 for diminished earning capacity, and $115,000 for past
and future medical expenses.

In a posttrial motion defendants sought judgment
notwithstanding the verdict, a new trial, or a reduction in the
damages assessed. The court denied most relief but reduced the
jury's assessment of medical expenses from $115,000 to
$46,281.75. The court entered judgment on the verdict, assessing
total damages of $886,281.75, and awarding plaintiff a judgment
for $709,025.40 (=.8 x $886,281.75). Defendants now appeal.

-12-

1-04-1079

## ANALYSIS

Defendants argue first that the court should have granted them a judgment notwithstanding the verdict.  That is, defendants argue that the evidence, viewed in the light most favorable to the verdict, so overwhelmingly favors defendants that no contrary verdict could ever stand.  Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967).

The parties agree that plaintiff walked across the parking lane on the south side of Huron and the lane next to it before the van struck him in the lane of travel nearer the north side of the street.  Both Urban's passenger and Johnston saw the peril and tried to shout warnings before plaintiff and Urban saw each other.  Plaintiff presented evidence that he crossed within the crosswalk, while Urban testified that he saw plaintiff walking between parked cars.  The jury reasonably concluded that both plaintiff and Urban acted negligently, as each should have seen the other in time to avoid the collision.  The jury found Urban, the driver who apparently accelerated without looking in front of the moving van, four times as negligent as plaintiff, the pedestrian who remained in the crosswalk.  The evidence as a whole does not favor defendants.  We see no basis for disturbing the jury's assessment of the negligence of the parties.  See Costello v. Chicago Transit Authority, 40 Ill. App. 3d 461

-13-

1-04-1079

(1976).

Defendants contend that the trial court did not impose a sufficiently severe sanction on plaintiffs for inadequate disclosure of Dr. Chmell's opinions. We defer to the trial court's judgment concerning sanctions for discovery violations. We will reverse the court's imposition of sanctions only if the court abused its discretion. Coleman v. Abella, 322 Ill. App. 3d 792, 799 (2001).

The court excluded Dr. Chmell's testimony from the evidence deposition interpreting the CAT scan and alluding to the possibility that plaintiff might need hip surgery. However, the court permitted some other testimony about the examination Dr. Chmell performed in May 2003, some months after the discovery deposition. Defendants learned of the May examination about six weeks before the evidence deposition and more than two months before trial. Defendants did not attempt to learn further about the conclusions Dr. Chmell reached in the most recent examination, either by supplemental interrogatories or by deposition.

To determine the appropriate sanction for a discovery violation, the court should consider:

"(1) surprise to the adverse party; (2) the prejudicial effect of the witness' testimony; (3) the nature of the

-14-

witness' testimony; (4) the diligence of the adverse party; (5) whether the objection to the testimony was timely; and (6) the good faith of the party calling the witness." Coleman, 322 Ill. App. 3d at 799.

Here, the court carefully weighed the appropriate factors and allowed only some of the opinions updated by the most recent examination. We agree with the court's assessment of defendants' diligence and surprise. We cannot say that the trial court abused its discretion in balancing the factors and fashioning a lesser sanction than defendants sought for discovery errors. See McGovern v. Kaneshiro, 337 Ill. App. 3d 24, 37-38 (2003). We note that the prognosis opinions Dr. Chmell gave at the discovery deposition may not have been admissible at trial, because he based those opinions on examinations performed some years before trial. See Marchese v. Vincelette, 261 Ill. App. 3d 520, 525 (1994).

The trial court also permitted Dr. Chmell to testify that defendants' attorneys had hired him to work for them as an expert in another case. We review the court's decision on the propriety of redirect examination for abuse of discretion. See People v. Johnston, 267 Ill. App. 3d 526, 538 (1994).

Courts generally permit a party to show possible bias with evidence that the proponents of an expert paid for his testimony.

1-04-1079

Niewold v. Fry, 306 Ill. App. 3d 735, 743 (1999). Similarly, courts generally admit evidence that an expert earns a significant income from testifying, that he usually testifies for one side (Trower v. Jones, 121 Ill. 2d 211, 217-19 (1988)), and that he testified for the same attorney in other cases (Sears v. Rutishauser, 102 Ill. 2d 402, 409 (1984)). When one party attacks the credibility of an expert with such evidence of bias, the party presenting the witness has the right to rehabilitate the expert with evidence showing that the expert exercises independent judgment. Lagoni v. Holiday Inn Midway, 262 Ill. App. 3d 1020, 1031. Evidence that the opposing party's attorney has also used the witness as an expert tends to bolster the credibility of the expert. See Chapman v. Hubbard Woods Motors, Inc., 351 Ill. App. 3d 99, 111 (2004) (evidence opposing party originally hired expert has probative value); Fenlon v. Thayer, 127 N.H. 702, 708-09, 506 A.2d 319, 323 (1986) ("the fact that a party's adversary first contacted the expert is material to the weight and credibility of that expert's testimony, and we think the jury should have the opportunity to consider this fact").

Here, defendants attacked Dr. Chmell's credibility with evidence concerning his fee and the portion of his income earned from expert testimony. We find that the trial court did not abuse its discretion by permitting plaintiff to respond with

evidence that defendants' attorney also hired Dr. Chmell to testify in other cases.

Next, defendants contend that the trial court abused its discretion by permitting Dr. Gamboa to testify to his estimate of the value of plaintiff's lost earning capacity. Dr. Gamboa, a vocational counselor, testified that he based his estimate of diminished earning capacity on an interview with plaintiff and data concerning plaintiff's earnings, age and education, in conjunction with government statistics. Defendants do not dispute Dr. Gamboa's qualifications and they do not disagree with his use of all the data he used to support his estimate of diminished earning capacity.

Defendants argue that Dr. Gamboa should have given more weight to the fact that plaintiff earned more in 2001, the year following the accident, than he earned in the last year before the accident. Dr. Gamboa relied on government statistics that did not distinguish differences in the extent of partial disabilities and the effect of the disabilities in different occupations. The data only distinguished nonsevere work disabilities from severe work disabilities.

Dr. Gamboa provided an adequate foundation for his opinion with his credentials and his use of data typically used by persons in his profession. See Becht v. Palac, 317 Ill. App. 3d

1026, 1034 (2000). Defendants' arguments go to the weight and credibility of Dr. Gamboa's testimony, not to its admissibility. See Snelson v. Kamm, 204 Ill. 2d 1, 26-27 (2003); LaSalle National Bank v. Malik, 302 Ill. App. 3d 236, 243 (1999). We cannot say that the trial court abused its discretion by admitting Dr. Gamboa's testimony into evidence.

We note that defendants used the gain in actual earnings effectively to impeach Dr. Gamboa. The jury found that plaintiff showed that he would lose $200,000 in earnings, and that amount is less than one-fourth of Dr. Gamboa's estimate of lost earnings. An accountant estimated that plaintiff's disability would reduce his work life expectancy from 27.7 years to 24.2 years. At plaintiff's 2001 earnings of nearly $60,000 per year, 3.5 years of diminished work life will cost plaintiff about $200,000 in lost earnings. Even if the jury completely rejected Dr. Gamboa's testimony, the evidence supports the assessment of $200,000 in lost earnings. See Stringham v. United Parcel Service, Inc., 181 Ill. App. 3d 312, 317 (1989) (uses change in expected work life to estimate lost earnings).

Defendants next contend that plaintiff's improper comments in closing argument deprived defendants of a fair trial. For all but one of the remarks, the trial court sustained defendants' objections and gave defendants all of the relief they requested

1-04-1079

by instructing the jurors to disregard the improper comments. We usually regard this relief as sufficient to cure prejudice from improper remarks. Magna Trust Co. v. Illinois Central R.R. Co., 313 Ill. App. 3d 375, 395 (2000).

Here, plaintiff's counsel injected his personal beliefs into the argument when he said he believed that Urban would have tried to avoid plaintiff if he had seen him between parked cars, two lanes away from the point of contact. The irrelevant remark that "the same kind of defense was used" in another case had no support in the evidence. To protect his client against possible prejudice against fraternity members counsel told the jurors they needed to "walk that journey with Matt" for purposes of this case. Counsel commented on defendant's failure to call a treating physician, in response to defendants' argument that plaintiff chose to call only the treating physicians who best supported plaintiff's case. And counsel remarked on the number of different representatives who had appeared at trial on behalf of Advantage. We find that none of the arguments so severely prejudiced defendants that the trial court could not effectively ameliorate the damage with the simple instruction to disregard the improper comment.

The court permitted plaintiff's counsel to contrast his use of treating physicians, including Dr. Chmell and plaintiff's

-19-

psychiatrist, with defendants' use of nontreating experts.  The comment emphasized the separate payment solely for the testimony of defendants' experts as part of showing a possibility of bias. The comment appears to explore permissible impeachment of experts.  See Sears, 102 Ill. 2d at 408; Niewold, 306 Ill. App. 3d at 743.  The trial court did not abuse its discretion by permitting the comment.

The trial court can best evaluate the effect of improper comments and the efficacy of instructions to disregard.  Magna Trust, 313 Ill. App. 3d at 395.  Nothing in the record shows that the trial court here assessed incorrectly the prejudicial effect of the closing argument.  Considering the cumulative impact of the improper comments, we still find no grounds for disturbing the trial court's judgment.

Finally, defendants object that no evidence warranted two of the instructions the trial court gave.  The trial court has discretion to decide which instructions to give the jury, and we will not reverse the court's judgment unless it abused its discretion and seriously prejudiced a party's right to a fair trial.  Frank v. Edward Hines Lumber Co., 327 Ill. App. 3d 113, 119 (2001).  The court should instruct the jury on a party's theory, if any evidence supports the theory.  McShane v. Chicago Investment Corp., 235 Ill. App. 3d 860, 876 (1992).

Here, plaintiff and Johnston testified that they heard no horn before impact. An ordinance requires all drivers to sound their horns to warn pedestrians of possible collisions. Johnston and Urban's passenger each saw the approaching collision and shouted warnings before impact. The evidence can support the conclusion that if Urban had looked ahead as he entered the intersection, he would have seen plaintiff in time to honk a warning, possibly avoiding the collision. The trial court did not abuse its discretion by instructing the jury on plaintiff's theory that Urban negligently failed to sound his horn.

Plaintiff's friends and his psychologist testified that plaintiff changed a great deal following the accident. He became reticent, anxious and insecure, and he appeared to derive less enjoyment from everyday social interactions. He also engaged in much less physical activity after the accident. The trial court did not abuse its discretion by instructing the jury on loss of a normal life as an element of plaintiff's damages. See Smith v. City of Evanston, 260 Ill. App. 3d 925, 938 (1994). Furthermore, we cannot say that the size of the verdict shocks the conscience or that it shows that the jury must have acted out of prejudice or passion. See Richardson v. Chapman, 175 Ill. 2d 98, 113 (1997).

Defendants tried to show the bias of plaintiff's physician

with evidence that the doctor earns a significant portion of his income from expert testimony and he charges a substantial fee for his testimony in court. We hold that the trial court did not abuse its discretion by permitting plaintiff to rehabilitate his witness with evidence that, in other cases, the witness also consulted with the law firm that represented defendants in this case. The evidence amply supports the finding that defendants acted negligently and contributed to the causation of the damages plaintiff suffered. The court did not abuse its discretion by limiting the sanction against plaintiff to elimination of only a part of his physician's testimony, especially because defendants did not act with diligence when they received medical records that disclosed a recent examination that updated the physician's opinions. The court did not abuse its discretion by permitting a vocational rehabilitation expert testify to his estimate of plaintiff's lost earning capacity, by sustaining most of defendants' objections to plaintiff's closing argument, or by instructing the jury on the duty to sound a horn and plaintiff's loss of a normal life as an aspect of damages. Accordingly, we affirm the judgment of the trial court.

Affirmed.

FITZGERALD SMITH, P.J., and JOSEPH GORDON, J., concur.