# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Pontiac National Bank v. Vales**, 2013 IL App (4th) 111088

---

| | |
|---|---|
| Appellate Court Caption | PONTIAC NATIONAL BANK, Administrator of the Estate of Christian Rivera, Deceased, Plaintiff-Appellant, v. JAMES VALES, KAREN B. HARRIS, Cotrustee of the James B. Harris Residual Trust, and OSF HEALTHCARE SYSTEM, d/b/a St. Joseph PromptCare and d/b/a OSF Medical Group, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-11-1088 |
| Filed<br>Modified upon<br>denial of rehearing | May 24, 2013<br><br>August 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The verdict for all defendants in an action alleging medical negligence in the treatment of the mediastinal tumor suffered by plaintiff's deceased was reversed and the cause was remanded for a new trial on the ground that the trial court abused its discretion in allowing defense counsel to question plaintiff's expert about his earnings from expert testimony for the eight years prior to the trial, rather than the prior two years ordinarily accepted under the decision of the Illinois Supreme Court in *Trower*, and in refusing to allow plaintiff an opportunity to show that defense counsel had used plaintiff's expert as a witness in prior cases. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 05-L-58; the Hon. Paul G. Lawrence, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | James P. Ginzkey, of Bloomington, for appellant. |

Joshua G. Vincent, Paul C. Estes, and Jesse A. Placher, all of Hinshaw & Culbertson LLP, of Chicago, for appellees.

Panel   JUSTICE CATES delivered the judgment of the court, with opinion.

Justices Welch and Goldenhersh concurred in the judgment and opinion.

**OPINION**

¶ 1  The plaintiff, Pontiac National Bank, administrator of the estate of Christian Rivera, deceased, filed a wrongful death and survival action, asserting theories of medical negligence and institutional negligence, against the defendants, James Vales, Karen B. Harris, cotrustee of the James B. Harris Residual Trust, and OSF Healthcare System, d/b/a St. Joseph PromptCare and d/b/a OSF Medical Group. Following a trial, the jury returned verdicts in favor of all defendants. On appeal, the plaintiff contends that (a) the trial court issued erroneous rulings regarding the scope of cross-examination and the rehabilitation of one of its expert witnesses, (b) the trial court erred in hearing and granting an untimely motion for a summary judgment, and (c) the trial court erred in allowing a defense expert witness to offer opinions that were not disclosed more than 60 days before the trial. For reasons to be stated, we reverse the judgment and remand this case for a new trial.

¶ 2  During the evening of July 23, 2003, Christian Rivera, a three-year-old boy, was at his home with his grandparents when he collapsed and stopped breathing. Christian's grandparents called 9-1-1 and began cardiopulmonary resuscitation. Medics responded, assumed resuscitation efforts, and treated Christian during transport to St. Joseph Medical Center. Christian was evaluated in the emergency department. A chest X-ray revealed a massive mediastinal tumor. The tumor was wrapped around Christian's airway, compressing it. The tumor compromised the airway, causing respiratory failure and cardiac arrest. A biopsy of the tumor confirmed a diagnosis of non-Hodgkin's lymphoma. Neurological testing of Christian's brain revealed that he had suffered hypoxic, ischemic encephalopathy, a severe brain injury caused by oxygen deprivation, as a result of the cardiopulmonary arrest. Christian did not survive these injuries, and he passed away on August 18, 2003.

¶ 3  During the six-month period preceding the cardiopulmonary arrest, Christian had been evaluated and treated for respiratory symptoms at St. Joseph PromptCare (PromptCare), an urgent care clinic, and OSF Medical Group, a primary care center. At that time, OSF Healthcare System (OSF) owned both facilities.

¶ 4  On January 12, 2003, Christian presented to PromptCare with left ear pain and a history of a cough that increased at night. James Vales, M.D., a family practice physician employed by OSF, evaluated Christian that day. Dr. Vales noted that Christian's tonsils were red and

swollen, that his left eardrum was red and had fluid behind it, and that his cervical lymph nodes were swollen. Dr. Vales diagnosed tonsillitis, otitis media, and bronchitis. He prescribed an antibiotic and instructed Christian's mother to follow up with Christian's primary care physician at OSF Medical Group if his condition changed or worsened. Five weeks later, Christian returned to PromptCare with a history of a weeklong cold with nasal congestion, a cough of two days' duration, and a right ear ache. Dr. Vales evaluated Christian and diagnosed bilateral otitis media. He prescribed an antibiotic and instructed Christian's mother to follow up with the primary care physician.

¶ 5        On June 18, 2003, Christian presented to PromptCare with a history of coughing at night. Dr. Vales evaluated Christian. He noted fluid behind both ears, redness of the eardrums, and nasal congestion. Dr. Vales diagnosed bilateral otitis media and an upper respiratory infection. He prescribed an antibiotic and a cough syrup, and he instructed Christian's mother to follow up with the primary care physician if Christian's condition changed or worsened.

¶ 6        On July 9, 2003, Christian returned to PromptCare with symptoms of wheezing and an occasional cough. Dr. Vales examined Christian and noted tightness in the chest, but no wheezing. Dr. Vales did not order a chest X-ray or any other diagnostic tests. He diagnosed left otitis media and bronchospasm. He prescribed a different antibiotic and albuterol syrup.

¶ 7        On July 14, 2003, Christian presented to OSF Medical Group with a cough and continued wheezing. He was evaluated by James Harris, a certified physician assistant (PA) employed by OSF. PA Harris noted scattered rhonchi with bilateral inspiratory-expiratory wheezing in the lungs. He did not order a chest X-ray or other diagnostic tests. PA Harris administered an albuterol treatment. He noted that the treatment resolved the wheezing, but the rhonchi remained. He diagnosed acute persistent bronchitis. PA Harris continued the albuterol syrup and the antibiotic, and he added a prescription for pediatric prednisone. He instructed Christian's mother to follow up as needed. Nine days later, Christian suffered the cardiopulmonary arrest.

¶ 8        The plaintiff filed a wrongful death and survival action on behalf of Christian Rivera, deceased, alleging theories of medical negligence and institutional negligence against the defendants. The plaintiff claimed that Dr. Vales was negligent in that he failed to order a chest X-ray, he failed to order diagnostic tests to assess Christian's chronic respiratory symptoms, he failed to obtain an infectious disease or pulmonary consultation, and he failed to review or appreciate the medical significance of Christian's recent medical history of chronic respiratory disease. The plaintiff claimed that PA Harris was negligent in that he failed to order a chest X-ray, he prescribed a steroid without first obtaining a chest X-ray, he failed to order diagnostic tests to assess Christian's chronic respiratory symptoms, he failed to obtain an infectious disease consultation or pulmonary consultation, and he failed to review and/or failed to appreciate the significance of Christian's past medical history of chronic respiratory disease. The plaintiff theorized that given Christian's symptoms of wheezing, a nocturnal cough, and ongoing upper respiratory ailments, a reasonably careful family physician or physician assistant would have obtained a chest X-ray in June or July 2003, that a chest X-ray would have shown that a mediastinal mass was compromising Christian's airway, and that Christian's condition would have been timely diagnosed and successfully treated.

¶ 9       The plaintiff's institutional negligence claims centered on OSF's failure to make primary care records from OSF Medical Group accessible to PromptCare physicians, OSF's policy restricting PromptCare physicians from providing longitudinal care, and OSF's failure to advise PromptCare patients of those policies and procedures.

¶ 10      Following a trial in July 2011, the jury returned a verdict in favor of all defendants. The plaintiff's posttrial motion was denied and this appeal followed.

¶ 11      In its first point, the plaintiff contends that the trial court abused its discretion in permitting the defense to question its expert, Dr. Finley Brown, about his annual earnings from expert witness services for an eight-year period, from 2003 through 2011. The plaintiff argues that inquiry into the income earned by Dr. Brown in providing expert testimony should have been limited to his annual earnings during the two-year period prior to the trial. The plaintiff claims that an inquiry into the past expert earnings for a two-year period prior to the trial is sufficient to expose any bias on the part of the expert. The plaintiff also contends that it should have been allowed to rehabilitate Dr. Brown with evidence that he had been retained as an expert by the defendants' law firm and that his earnings from providing expert testimony on behalf of physicians were lucrative.

¶ 12      The defendants argue that the trial court's ruling permitting them to ask Dr. Brown about his earnings for the period from two years prior to the time he was retained as an expert through the time of trial, a period of almost eight years, was proper and within its discretion. The defendants also argue that the plaintiff waived any objections to the court's rulings because the earnings information was elicited by the plaintiff during the direct examination of Dr. Brown.

¶ 13      Initially, we address the defendants' waiver contention. The record shows that the trial court heard arguments on the issue of the extent to which Dr. Brown could be examined about his past earnings as an expert witness on the second day of testimony, after the jury had been excused for the day. The parties had submitted trial memoranda on the issue to the court earlier that day. The plaintiff argued that inquiry into the past expert earnings for a period of two years is sufficient to expose any bias on the part of the expert. The defendants countered that in order to explore Dr. Brown's biases as a professional witness, they should be permitted to inquire about his earnings for the period from two years prior to the time he was retained as an expert through the time of trial, a period of almost eight years. After considering the arguments of counsel, the trial court denied the plaintiff's motion to limit the inquiry on expert earnings to the two-year period prior to the trial. The court ruled that the defense could question Dr. Brown about his earnings for the period from 2003 through the date of the trial. During the hearing, the trial court also confirmed a pretrial ruling and ordered the plaintiff to refrain from presenting evidence that Dr. Brown had been previously retained as an expert witness and paid a substantial fee by the law firm which was currently representing the defendants. Immediately after the trial court issued these rulings, the plaintiff moved for a mistrial. That motion was denied. The plaintiff then issued a trial subpoena to defense counsel directing their law firm to produce copies of all 1099 forms issued to Dr. Brown from 1998 to the present. The plaintiff noted that it sought the documents for purposes of rebutting the defendants' position that Dr. Brown was biased in favor of plaintiffs and making an offer of proof. Pursuant to the defendants' motion, the trial

court quashed the subpoena.

¶ 14    The record shows that Dr. Brown was the plaintiff's first witness the next morning. During the direct examination, the plaintiff asked Dr. Brown about his credentials and his compensation for working on the case at bar. The plaintiff then asked about Dr. Brown's earnings throughout his years as an expert witness, and Dr. Brown noted that early on he had primarily testified for physicians and then later for plaintiffs.

¶ 15    During cross-examination, the defense elicited more detailed information from Dr. Brown about his earnings as an expert witness from 2003, two years before this case was filed, through the trial in July 2011. The defense attempted to show that Dr. Brown's opinions were tainted by bias and were the product of partisanship and financial interests. At one point during cross-examination, defense counsel referred to Dr. Brown as a "go-to-guy for expert opinions." On redirect, the plaintiff was denied the opportunity to rehabilitate Dr. Brown with evidence showing that he had been regularly retained by the law firm representing the defendants in this case during that same time period. During closing argument, the defense described Dr. Brown as a multimillionaire who had been making "these great dollars" by testifying for the plaintiff 90% of the time over the last several years. The defense pointedly stated that Dr. Brown had a very strong financial incentive to produce a particular opinion in this case and that his credentials were sorely deficient.

¶ 16    In this case, the record clearly establishes that the challenged evidentiary rulings on the scope of the expert's earnings were made during the trial and were not interlocutory, *in limine* rulings that were subject to reconsideration as the evidence unfolded during the trial. The record also shows that the plaintiff made a contemporaneous objection and sought a ruling the evening before its expert took the witness stand. When the court overruled the plaintiff's objection, the plaintiff immediately moved for a mistrial, which was denied. At that point, the plaintiff had to choose between introducing information about Dr. Brown's expert earnings during direct examination and allowing the defendants to elicit the information during cross-examination, thereby suggesting that the plaintiff was hiding information about its expert from the jury. Where the plaintiff's exclusionary motion was denied and its anticipatory disclosure was designed to reduce the prejudicial effect of the evidence, the plaintiff did not forfeit its challenge to the evidentiary rulings. See *People v. Spates*, 77 Ill. 2d 193, 199-200, 395 N.E.2d 563, 566 (1979); *Brown v. Baker*, 284 Ill. App. 3d 401, 406, 672 N.E.2d 69, 72 (1996). The plaintiff adequately preserved its objections for review. We now consider the merits of those objections.

¶ 17    Ordinarily, in a medical negligence case, a jury must decide whether a defendant physician deviated from the applicable standard of care based upon the expert medical testimony given during the trial. In such cases, expert testimony has been tested through traditional tools of cross-examination. In response to the prevalence of expert testimony in modern-day litigation and the difficulty of disproving an expert's opinion testimony, the Illinois Supreme Court decided to expand the permissible bounds of expert cross-examination. See *Trower v. Jones*, 121 Ill. 2d 211, 217, 520 N.E.2d 297, 300 (1988); *Sears v. Rutishauser*, 102 Ill. 2d 402, 407, 466 N.E.2d 210, 212-13 (1984). In those cases, the supreme court held that it is permissible to cross-examine an expert witness about the amount and percentage of income that he generates from his work as an expert witness, the

frequency with which he testifies as an expert, and the frequency with which he testifies for a particular side, in order to expose any bias, partisanship, or financial interest that may taint his testimony and opinions. *Trower*, 121 Ill. 2d at 217, 520 N.E.2d at 300; *Sears*, 102 Ill. 2d at 407, 466 N.E.2d at 212-13. Nevertheless, cross-examination is not a "free-for-all." It is not a proper function of cross-examination to harass expert witnesses or to unnecessarily invade their legitimate privacy. Such unbridled cross-examination discourages reputable professionals from testifying during trial, making it difficult for parties to obtain the expert testimony necessary to meet their burden of proof.

¶ 18        In *Trower*, our supreme court did not set an outside limit on the number of years of earnings that can be discussed during the cross-examination of an expert to show financial interest, but found "no impropriety in inquiring into such income for the two years immediately preceding trial." *Trower*, 121 Ill. 2d at 218, 520 N.E.2d at 300. Mindful that the relevant question is whether the expert witness has some personal or financial incentive to produce a particular opinion, and applying the reasoning in *Trower*, we conclude that permitting inquiry into the amount of income an expert witness has earned from expert services during the two-year period immediately preceding the trial would, under ordinary circumstances, serve the legitimate purposes for this type of cross-examination. We recognize that the trial court has discretion to oversee the trial process and that it must have some leeway to reasonably extend the bounds of this type of cross-examination should the individual facts in a case so require. Having said that, we find that such an extended inquiry was unnecessary and unreasonable under the facts of this case.

¶ 19        After a careful review of the record, we find that the trial court's decision to permit the defense to inquire into Dr. Brown's earnings from expert testimony for the eight-year period prior to the trial was a clear abuse of its discretion. The record shows that the legitimate bounds of cross-examination were trampled and that the plaintiff's case was so unfairly prejudiced that a new trial is required. While cross-examination is permissible to expose bias, partisanship, or financial interest of the expert witness, there is a point beyond which the inquiry amounts to harassment or invasion of privacy and diverts the proceedings into the trial of a collateral matter. In this case, we believe that the bias or financial interests of each party's experts can be adequately explored and exposed, without undue harassment or unnecessary invasion of privacy, if each party is permitted to question its opponents' experts about their annual earnings from expert services for the two-year period preceding the new trial date.

¶ 20        The trial court abused its discretion and compounded the prejudice when it denied the plaintiff an opportunity to rebut the defendants' attacks with evidence showing that the defendants' attorneys had retained Dr. Brown as an expert witness in several cases in the past. When one party attacks the credibility of an expert in order to show that his testimony is tainted by bias, partisanship, or financial interest, the party who presented that witness has the right to rehabilitate the expert with evidence showing that the expert exercises independent judgment. *Shaheen v. Advantage Moving & Storage, Inc.*, 369 Ill. App. 3d 535, 544, 860 N.E.2d 375, 383 (2006). Evidence that the opposing party's attorney also employed the witness as an expert tends to rehabilitate the expert. *Shaheen*, 369 Ill. App. 3d at 544, 860 N.E.2d at 383. In this case, the defense was permitted to question the plaintiff's expert

witness about his earnings from expert services for an eight-year period immediately preceding the trial, arguing that the expert's testimony and opinions were tainted by bias, partisanship, and financial interest. In doing so, the defense invited a rebuttal on those points, but the trial court did not allow the plaintiff an opportunity to rebut the attacks and rehabilitate its witness. As a result, the plaintiff was unfairly prejudiced.

¶ 21        After reviewing the record, we cannot conclude that the trial court's erroneous rulings regarding the cross-examination and the rehabilitation of the plaintiff's expert had no impact on the verdict. Therefore, we must reverse the judgment for all defendants and remand this case for a new trial.

¶ 22        Although the resolution of this issue is dispositive of the appeal, we will briefly address a few additional points raised on appeal that served to compound the prejudice to the plaintiff's case and are reasonably likely to recur on remand.

¶ 23        The plaintiff challenges the propriety of the use of a publication from the United States Bureau of Labor Statistics during the cross-examination of Dr. Brown.

¶ 24        The record shows that when defense counsel commenced his cross-examination of Dr. Brown, he produced an Internet copy of a publication entitled "Occupational Employment and Wages, May 2010," from the United States Bureau of Labor Statistics, and he asked the trial court to "take recognition" that it was a business record of the United States government. The publication contains employment estimates and wage estimates as of May 2010 for physicians who practice family and general medicine. The plaintiff objected that the data in the publication was irrelevant. Defense counsel argued that the data regarding the annual earnings of a family practice physician was relevant to place Dr. Brown's annual earnings into perspective. The plaintiff countered that the publication did not include an earnings category for family physicians who consult on medical-legal cases. The trial court overruled the plaintiff's objection, but there is no indication that it expressly ruled on defense counsel's request that the publication be recognized as a business record. Defense counsel proceeded to use the publication to contrast the estimated mean annual wages and estimated mean hourly wages earned by family practice physicians, nationally and in Chicago as of May 2010, with Dr. Brown's annual earnings for his medical-legal consulting work in the years 2003, 2004, and 2005.

¶ 25        After reviewing the record, we find that the trial court erred in permitting the defense to use this publication to cross-examine Dr. Brown about his earnings from his consulting work. Initially, we note that the publication was not authenticated. To the extent that the defense was asking the trial court to take judicial notice of the publication, it failed to lay any foundation to establish that the publication contains the type of readily verifiable facts that are proper for judicial notice in this type of case. *Weekly v. Solomon*, 156 Ill. App. 3d 1011, 1015, 510 N.E.2d 152, 155 (1987). Moreover, assuming that the data was subject to judicial notice, it had little probative value for the purposes employed. The introduction of this type of irrelevant material in an attempt to expose the financial interests or bias of an expert witness serves to create rather than avoid a confusion of issues and to unduly lengthen the trial, two matters about which the supreme court expressed policy and practical concerns in its decisions to broaden the scope of cross-examination of expert witnesses. See *Trower*, 121

Ill. 2d at 219, 520 N.E.2d at 301; *Sears*, 102 Ill. 2d 402, 466 N.E.2d 210. The use of this publication to cross-examine Dr. Brown about his earnings from his consulting work was improper and unfairly prejudicial, and it should not be permitted on retrial.

¶ 26　　The plaintiff claims that the trial court erred in hearing and granting OSF's untimely motion for a summary judgment on an allegation of institutional negligence.

¶ 27　　In the institutional negligence count against OSF, the plaintiff alleged in pertinent part that OSF breached its duty to act as a reasonably careful hospital and healthcare facility, in that (a) it had a policy wherein its primary healthcare patients who did not have appointments were referred to PromptCare, but PromptCare was not given access to the primary care records, (b) it had a policy restricting PromptCare physicians and physician assistants from providing longitudinal care, thereby limiting the patients' history and/or patients' charting to said physicians and physician assistants, (c) it had a policy restricting PromptCare physicians from providing longitudinal care, thereby unreasonably interfering with its employed physician's exercise and execution of his or her professional judgment and adversely affecting the physician's ability to provide quality care to patients, in violation of section 10.8 of the Hospital Licensing Act (Act) (210 ILCS 85/10.8 (West 2002)), and (d) it failed to disclose these policies to patients and their families.

¶ 28　　The record shows that OSF filed a motion for a summary judgment as to each of the above allegations on the eve of the trial. The parties agree that the final pretrial scheduling order did not include a deadline for filing dispositive motions. Thus, the summary judgment motion was filed very late in the proceedings, but technically not filed out of time. OSF's eleventh-hour filing placed a heavy burden on the plaintiff because it did not have an adequate opportunity to prepare a written brief, supported by pleadings, deposition excerpts, and other documentation, in opposition prior to the hearing on the motion. The report of proceedings indicates that the trial court recognized as much. Although OSF moved for a summary judgment as to all four allegations of institutional negligence, the trial court granted a summary judgment only on allegation (c). In denying summary judgment as to the other allegations, the court noted that OSF could move for directed findings on the remaining allegations at the close of the plaintiff's case if it believed that there was insufficient evidence for the jury's determination. In our view, the summary judgment motion should have been denied in its entirety where the record shows that OSF filed the motion on the eve of trial, that the plaintiff was not provided with adequate notice of the motion, and that the plaintiff was deprived of an opportunity to prepare a response.

¶ 29　　Next, we consider whether the trial court erred in granting a summary judgment on allegation (c). A summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, when viewed in a light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008). Summary judgment is a drastic measure and should be granted only if the movant's right to judgment is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). The grant of a summary judgment is reviewed *de novo*. *Outboard Marine*, 154 Ill. 2d at 102, 607 N.E.2d at 1209.

¶ 30    In regard to allegation (c), OSF acknowledged that it had a policy restricting PromptCare physicians from providing longitudinal care, but it argued that its policy restricting longitudinal care did not violate section 10.8 of the Act. OSF noted that subsection 10.8(a)(3) provides, in part, that a hospital or hospital affiliate shall not unreasonably interfere with an employed physician's professional judgment, and that subsection 10.8(b) defines professional judgment as the exercise of a physician's independent clinical judgment in providing medically appropriate diagnoses, care, and treatment to a particular patient at a particular time. OSF concludes that the summary judgment was properly entered on paragraph (c) because its policy prohibiting longitudinal care did not place limitations on the care provided by a PromptCare physician to a particular patient at a particular time.

¶ 31    After reviewing the record, we find that OSF failed to show that it was entitled to a summary judgment on paragraph (c) as a matter of law. If the jury accepts the plaintiff's position, it could reasonably find or infer that OSF's policy restricting PromptCare physicians from providing longitudinal care unreasonably interfered with PromptCare physicians' exercise of independent clinical judgment in diagnosing and treating patients, in violation of section 10.8 of the Act, where that policy, taken together with OSF's practice of authorizing OSF Medical Group personnel to reroute its primary care patients who did not have appointments to a PromptCare facility, effectively prevented PromptCare physicians from accessing the primary care records of and providing continuity of care to returning walk-in patients, such as Christian Rivera. Based on the record, the entry of a summary judgment on allegation (c) was improper and is hereby set aside.

¶ 32    The plaintiff also challenges the timeliness of the disclosure of certain opinions of one of the defense experts. We find it unnecessary to address the merits of this issue as it is not likely to recur and would unnecessarily lengthen this opinion. We note, however, that the issues regarding the timeliness of the summary judgment motion and the timeliness of the disclosure of certain opinions of a defense expert might have been avoided had an order been prepared in accordance with Illinois Supreme Court Rule 218(c) (eff. Oct. 4, 2002). On remand, the trial court and the parties will have an opportunity to set specific dates for the completion of any additional discovery, the disclosure of opinions of witnesses, and the filing of dispositive motions.

¶ 33    For the reasons stated, the judgment of the circuit court of McLean County is reversed and the cause is remanded for a new trial.

¶ 34    Reversed and remanded.