# Illinois Official Reports

## Appellate Court

---

### *Beaman v. Freesmeyer*, 2019 IL App (4th) 160527

---

| | |
|---|---|
| Appellate Court Caption | ALAN BEAMAN, Plaintiff-Appellant, v. TIM FREESMEYER, Former Normal Police Detective; DAVE WARNER, Former Normal Police Detective; FRANK ZAYAS, Former Normal Police Lieutenant; and THE TOWN OF NORMAL, ILLINOIS, Defendants-Appellees. |
| District & No. | Fourth District<br>No. 4-16-0527 |
| Filed | December 17, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 14-L-51; the Hon. Richard L. Broch, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | David M. Shapiro and Locke E. Bowman, of Roderick and Solange MacArthur Justice Center, and Jeffrey Urdangen, of Bluhm Legal Clinic, both of Northwestern Pritzker School of Law, of Chicago, for appellant.<br><br>Thomas G. DiCianni, of Ancel Glink P.C., of Chicago, for appellees.<br><br>Arthur Loevy, Jon Loevy, Steven Art, and Alison R. Leff, of Loevy & Loevy, of Chicago, for *amici curiae* former prosecutors Stuart Chanen *et al.* |

Tamara L. Cummings, of Western Springs, Bruce Bialorucki, of Springfield, Dan Hassinger, of Decatur, and Pasquale A. Fioretto, of Baum Sigman Auerbach & Neuman, Ltd., of Chicago, for *amici curiae* Illinois FOP Labor Council *et al.*

Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Elizabeth Mary Tisher, Assistant Corporation Counsel, of counsel), for *amici curiae* City of Chicago *et al.*

Panel      JUSTICE KNECHT delivered the judgment of the court, with opinion. Justices Steigmann and Harris concurred in the judgment and opinion.

## OPINION

¶ 1  In 2008, the Supreme Court of Illinois overturned plaintiff's conviction for the murder of his ex-girlfriend, Jennifer Lockmiller, upon concluding the State violated his right to due process when it failed to disclose material and exculpatory information about an alternative suspect. *People v. Beaman*, 229 Ill. 2d 56, 890 N.E.2d 500 (2008). In April 2014, plaintiff initiated this action, alleging defendants, Tim Freesmeyer, Dave Warner, and Frank Zayas, former officers in the Normal Police Department, acted maliciously in investigating him and in aiding in his prosecution. Plaintiff asserted claims of malicious prosecution, intentional infliction of emotional distress, and conspiracy. Plaintiff requested damages from defendant the Town of Normal on theories of *respondeat superior* and indemnification.

¶ 2  In June 2016, the trial court, finding no genuine issue of material fact as to plaintiff's claims of malicious prosecution, granted defendants' motion for summary judgment. Plaintiff appealed, arguing, in part, a reasonable jury could find in his favor on each of the elements of its malicious-prosecution claim. We affirmed, concluding the trial court properly found no genuine issue of material fact existed on the first element of malicious prosecution—the commencement or continuance of an original criminal or civil judicial proceeding by the defendants.

¶ 3  In February 2019, the Supreme Court of Illinois reversed our decision. The court concluded our review of the aforementioned element was improperly limited. The court remanded, directing this court to determine "whether the defendants' conduct or actions proximately caused the commencement or continuance of the original criminal proceeding by determining whether defendants played a significant role in [plaintiff's] prosecution." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 47.

¶ 4  On remand, we have considered the "significant role" test as set forth in *Beaman*, 2019 IL 122654, ¶ 45, and affirm the summary judgment order.

## I. BACKGROUND

Before summarizing the facts of this case, we note both sides of this dispute have hindered this court's ability to verify the facts set forth in the briefs. The parties, defendants more so, repeatedly failed to provide specific cites to the record to support their claims, thereby asking this court to perform appellate counsel's briefing duties. See Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018) (requiring the statement of facts contain "appropriate reference to the pages of the record on appeal"); see also *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 399, 701 N.E.2d 791, 799 (1998) ("Strict adherence to the requirement of citing relevant pages of the record is necessary to expedite and facilitate the administration of justice."). In the appellee brief, defendants routinely cited the first page of a deposition, instead of the page on which the support for the alleged fact may be found. By doing so, defendants ask this court to review hundreds of pages of deposition testimony to find the one or two pages containing specific facts in support of their defense. Both sides cited their statements of material facts filed in the trial court without providing citations to the appellate record for this court to verify those facts.

In addition, plaintiff's statement of facts is rife with argument and conclusions in violation of Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018) ("Statement of Facts *** shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment ***."). For example, headings in plaintiff's *statement of facts* include "Freesmeyer Delivers the Indictment and Conviction," "Defendants Ignore a Witness who Exonerates Beaman," and "Warner Hides Evidence."

In our attempt to summarize the evidence in this case, we rely primarily on the facts provided in the published cases on this matter. We also include facts that are readily verifiable, but we have not fulfilled appellate counsel's duties by using judicial resources to search the voluminous record to find support for every alleged fact.

### A. Lockmiller's Murder and the Investigation

On August 28, 1993, the body of Lockmiller, a 21-year-old student at Illinois State University, was found in her Normal, Illinois, apartment. Lockmiller's shirt was pulled up, exposing her breasts. Her shorts and underwear were down around one of her legs. The electrical cord of an alarm clock was around Lockmiller's throat. A pair of scissors protruded from her chest. A box fan had been placed over Lockmiller's face. A bag of trash, which may have been taken from a trash can, was found on the living room sofa. The kitchen sink was filled with dirty dishes. The book bags and purse found on a table appeared closed and undisturbed. The wallet contained $17.71 in cash. Both the air conditioner and television were on. The apartment showed no signs of forced entry. Lockmiller died from ligature strangulation with the cord of the alarm clock. The investigators found no one who had seen Lockmiller alive after her class ended at 11:50 a.m. on August 25, 1993.

A number of police officers from the Town of Normal Police Department (NPD) were involved in the investigation. These officers included defendants: Freesmeyer, a detective; Warner, a detective; and Zayas, a lieutenant. Early in the investigation, starting in October or November 1993, Freesmeyer served as the principal detective on the investigation. Warner's role included serving as an evidence custodian and investigating one of the suspects, Stacey Gates. Zayas supervised the detectives who worked on the investigation until he retired in November 1994. Other individuals involved in the investigation included Charles Reynard, the

McLean County State's Attorney, and James Souk, assistant state's attorney. Souk acted as the lead prosecutor in plaintiff's criminal case.

¶ 12     Police officers focused the investigation on plaintiff early in the case. Lockmiller's body was found by her friend, Morgan Keefe (now Hartman). Hartman attempted to contact Lockmiller for several days. Hartman went to Lockmiller's apartment. She called the police upon finding her body. Hartman told the police she knew "who did it." Hartman reported Lockmiller was afraid of plaintiff. She heard Lockmiller "say over and over and over again that she was afraid" of him. Lockmiller also reported to Hartman that plaintiff had broken down her door and threatened suicide if she broke up with him. Hartman "was aware" plaintiff "was possessive." Hartman stated Lockmiller usually kept her apartment tidy.

¶ 13     While investigating plaintiff, the officers learned plaintiff, a student at Illinois Wesleyan University, was residing with his parents in Rockford, Illinois, at the time of Lockmiller's murder. Rockford is approximately two hours from Normal by car. Detectives learned plaintiff occasionally sang and played guitar and saxophone for his church youth group while home from college. He was scheduled to rehearse on Wednesday, August 25, 1993, for the performance the following Sunday. Plaintiff and the youth pastor arranged that time as plaintiff's "parents were coming in."

¶ 14     Officers garnered information regarding plaintiff's and Lockmiller's relationship. Plaintiff and Lockmiller began a tumultuous relationship in July 1992. The two broke up and rekindled the relationship 17 to 18 times. The relationship ended about one month before the murder. Detectives learned of a history of loud arguments. One argument ended when plaintiff drank nail polish remover. According to letters found in Lockmiller's apartment after her murder, plaintiff wanted their relationship to be monogamous, but he suspected Lockmiller saw other men. In the letters, plaintiff expressed he loved her "more passionately than Romeo did Juliet, more hopelessly than Ophelia did Hamlet, more vengefully than Medea, Jason," and stated, "Don't worry, I won't kill anybody, I don't believe in that. I do unto others as I would have them unto me (from now on)." Shortly before her death, Lockmiller became involved with Michael Swaine, plaintiff's friend and roommate.

¶ 15     Lockmiller's apartment showed no sign of forced entry. The police investigated individuals Lockmiller knew. The police questioned Lockmiller's current boyfriend and plaintiff's roommate, Swaine, as well as former boyfriends including plaintiff, Gates, and Larbi John Murray. Swaine had an alibi. On August 25, 1993, the date the State concluded Lockmiller was murdered, Swaine was working at a bookstore in Elmhurst, Illinois. Gates, who had moved to Peoria to be closer to Lockmiller, also had an alibi. Records from a Peoria school showed Gates was at work on August 25.

¶ 16     The NPD officers learned Murray was Lockmiller's drug dealer. Murray and Lockmiller had also been lovers. Murray was twice interviewed by police. Initially, Murray reported leaving town on August 24, 1993, a day before the murder. Murray's girlfriend, Debbie Mackoway, however, told police they did not leave town until the afternoon of August 25. Murray then amended his story, and his version was consistent with Mackoway's report. Murray informed officers he was alone at home before 2 p.m. on August 25. Murray resided 1.5 miles from Lockmiller. Murray had a criminal history. He faced charges of drug possession with intent to deliver and of domestic violence for the abuse of Mackoway. According to Mackoway, Murray also began using steroids and behaved erratically. Both cocaine and steroids had been found in Murray's apartment. Murray agreed to submit to a polygraph

examination. At the start of the examination, Murray failed to follow instructions. The examiner terminated the examination.

¶ 17 Investigators interviewed David Singley, Lockmiller's neighbor. Singley informed investigators he arrived home from class at 2 p.m. on August 25 and heard someone slam the door to Lockmiller's apartment. Singley stated he heard the stereo, the door open and close a second time, and footsteps. Singley also reported noticing, around 4:30 p.m., the stereo was off and the television had been turned on.

¶ 18 Lockmiller's neighbors who lived directly below Lockmiller told detectives they overheard fights between Lockmiller and a man who drove a silver Ford Escort. Plaintiff drove a silver/grey Ford Escort. The neighbors recalled the fights occurred in January or February 1993. John Revis, another individual interviewed by Freesmeyer, reported once ripping off plaintiff during a drug deal.

¶ 19 In an August 28, 1993, interview by Freesmeyer of Swaine, Swaine reported he and plaintiff were friends. They were roommates for an unspecified time. Lockmiller and Swaine started a relationship while Lockmiller and plaintiff "were going out." Swaine reported plaintiff made two holes in Lockmiller's apartment walls. Swaine also reported the first time plaintiff broke into Lockmiller's apartment, he found Lockmiller "fooling around" with Murray. The second time occurred within two months of Lockmiller's death. Swaine was at Lockmiller's apartment. Plaintiff arrived and began screaming at Lockmiller. Swaine ran and hid in the bedroom closet. Swaine heard plaintiff scream, "I know you are in there." Plaintiff broke through the door. On a different date, plaintiff searched Lockmiller's trash, looking for Swaine's used condoms.

¶ 20 The investigation recovered seven fingerprints from the alarm clock found at Lockmiller's apartment. Two belonged to plaintiff, four to Swaine, and one remained unidentified.

¶ 21 As of August 29, 1993, one day after the discovery of the body, Souk concluded plaintiff was the only suspect, but other people could be potential suspects. According to Souk, he did not believe Murray had a motive to kill Lockmiller. While prosecuting plaintiff, Souk knew Murray had provided Lockmiller with narcotics and marijuana, and conflicting statements had been made about whether Lockmiller owed Murray money. Souk also knew Murray made a mistake regarding his alibi and corrected that mistake in a second interview. Souk did not find the mistake suspicious. At the time of the trial, Souk knew Murray began taking steroids in January 1994 and had begun acting erratically. Before that time, Murray had not been physically violent toward Mackoway.

¶ 22 In February 1994, Freesmeyer was involved in a consultation with the Chicago Police Department (CPD) regarding the investigation. As the NPD had limited experience in investigating homicides, the Normal chief of police suggested the consultation for suggestions on the investigation. A copy of the case report was sent to the CPD. Detectives from the CPD later met with Freesmeyer and others. The CPD detectives' only suggestion was "to continue to try to talk to [plaintiff] as long as [they] could."

¶ 23 On May 16, 1994, a meeting was held to determine whether to arrest plaintiff for Lockmiller's murder. Those in attendance included Reynard, Souk, Freesmeyer, Zayas, Normal Chief of Police James Taylor, and Detective Tony Daniels. During the meeting, Reynard decided to charge plaintiff. Souk agreed. At his deposition, Daniels testified he suggested a list of investigative avenues to pursue before arresting plaintiff. Souk responded, "I think we've got our guy[,] *** we went as far as we can with this case." Souk stated they

- 5 -

were going to go ahead and issue a warrant for plaintiff's arrest. Freesmeyer, in his deposition, testified no one at the hearing questioned the decision to arrest plaintiff. He had no memory of Daniels's suggestions. Plaintiff was arrested in May 1994.

¶ 24                                    B. Grand Jury Proceedings

¶ 25       In July 1994, proceedings on Lockmiller's murder were held before the grand jury. At the hearing, Souk conducted the questioning. Freesmeyer, as well as other witnesses, testified. During Freesmeyer's testimony, the following questioning occurred:

"Q. I want to go now to some alibi evidence. First as to Michael Swaine, before we get into his alibi, first let me ask you if your investigation revealed any conceivable motive that Michael Swaine might have had to kill Jennifer Lockmiller?

A. No, Michael was the present boyfriend. When we picked him up at the scene, extremely remorseful, crying and sobbing. We were able to find no motive whatsoever.

Q. *** [B]ut other than Mr. Beaman, were you able in the course of your investigation to locate any other person anywhere who had any conceivable motive to kill Jennifer Lockmiller?

A. No, not necessarily.

Q. Perhaps the best thing is why don't you just summarize for us Mr. Swaine's alibi and how you were able to establish it?

A. In speaking with Mr. Swaine, I asked him where he was that week."

¶ 26       Freesmeyer was questioned regarding whether his interviews of residents of the apartment building revealed anything helpful to the case. He answered they did not.

¶ 27       Souk also questioned Freesmeyer about the time trials he performed on the route from the Beaman residence in Rockford to Lockmiller's apartment and the routes he took from Bell Federal to the Beaman residence:

"A. However, considering the phone calls, if she would have left her mother's residence at 10:00 ***, she would have been home by 10:17. She could have made the calls at 10:37 and 10:39. Left the house and arrived back at Walmart at approximately 10:57 or 11:00 ***. Give her 10 minutes to go into three different departments at Walmart and check out. It would have been rushed, but it would be possible.

Q. And again, this was one of those rare occasions when you were driving the speed limit?

A. That is correct.

Q. Now did you also on two occasions do the same kind of timing from Bell Federal to the Beaman residence?

A. Yes, I did.

Q. On one of those occasions, did you basically drive it through town?

A. I drove the most direct route and I also drove what I thought to be the fastest route, the two most logical ways to get to the Beaman residence from Bell Federal.

Q. On both those occasions, did you drive the speed limit?

A. Yes. The trip through town, I drove the speed limit[,] and I drove it on a Wednesday afternoon at approximately 10:00 ***, so it would be very comparable to the time that Mr. Beaman would have driven that route.

Q. How long did that trip take going through town?

A. That trip took me 30 minutes. If he had left the bank at 11 minutes after 10:00, he'd [have] gotten home at 10:45. The calls were made at 10:37 and 10:39.

Q. When you drove it the other way, did you—from Bell Federal, if you go a couple miles south, do you get to this Route 20 going around the south side of town?

A. Yes, Bell Federal is on the corner of Newburg and Alpine. If you take Alpine straight south to 20 and around, that would be probably the quickest route to Mr. Beaman's residence, and that took me 25 minutes. So once again 25 added to the 10:11 would put me there at 10:36. The calls were at 10:37 and 10:39."

¶ 28                               C. Motion *in Limine*

¶ 29    Before trial, the State filed a motion *in limine* to exclude evidence of Lockmiller's relationships with men other than plaintiff and Swaine. The trial court reserved ruling on the motion. Later, the State and plaintiff's defense counsel discussed Lockmiller's relationship with an individual identified as "John Doe," who is Murray. Souk told the court Doe had "nothing to do with the case." Souk had not disclosed to plaintiff's trial counsel Murray's criminal records, which would have exposed his drug and steroid use, the incidents of domestic violence, or the incomplete polygraph examination. Plaintiff's trial counsel had no specific evidence pointing to another individual who could have committed the offense. The trial court granted the motion *in limine*.

¶ 30                          D. Plaintiff's Trial and Conviction

¶ 31    At trial, evidence established plaintiff, then a student at Illinois Wesleyan University, used Lockmiller's alarm clock to wake for class. During the course of their relationship, plaintiff stayed the night at Lockmiller's up to four or five times a week.

¶ 32    Singley testified at trial. During the 1993 spring semester, Singley, on multiple occasions, heard plaintiff pound on Lockmiller's door late at night. He also reported hearing plaintiff and Lockmiller yell at each other.

¶ 33    Plaintiff testified, on an unspecified night that same spring, Lockmiller called him to end their relationship. Plaintiff went to Lockmiller's residence to retrieve his compact disc player. Upon arriving at the apartment, plaintiff observed "John Doe's" car in the parking lot. Plaintiff pounded on Lockmiller's apartment door. Lockmiller refused to let him enter her apartment. Plaintiff continued pounding on the door and began kicking it, causing the door to break. Plaintiff discovered Doe and Lockmiller inside the apartment. Plaintiff grabbed his compact disc player and left. He yelled while inside the apartment but made no physical contact with Doe or Lockmiller.

¶ 34    Evidence established another incident during which plaintiff forcefully broke Lockmiller's apartment door. In the summer of 1993, Lockmiller was in a relationship with Swaine. One night in July 1993, plaintiff suspected Swaine was at Lockmiller's apartment. He broke the apartment door by pounding and kicking it. Upon entering the apartment, plaintiff did not see Swaine. Plaintiff verbally confronted Lockmiller but made no physical contact. Plaintiff remained at the apartment for 30 to 45 minutes.

¶ 35    Plaintiff testified his night shift at his uncle's grocery store ended at 9 a.m. on August 25. Plaintiff drove home to retrieve some cash and a check. He drove to the bank to make a deposit.

Plaintiff's trip to the bank was confirmed by a bank security videotape that showed plaintiff leaving the bank at 10:11 a.m. Plaintiff returned home and slept until 5 p.m.

¶ 36 Telephone records demonstrated two calls were made from the Beaman residence at 10:37 and 10:39 a.m. on August 25. The first call was to the plaintiff's church, the second to the church's director of music and youth ministries. Only two people could have made those calls: plaintiff and his mother, Carol Beaman. Plaintiff did not recall placing those calls but stated he could have done so. Carol denied making the calls. She testified she left the Beaman residence around 7 a.m. and drove to her mother's assisted-living facility. Carol took her mother to the clinic and returned to the facility around 10 a.m. Carol testified to having spent 15 to 20 minutes with her mother inside the facility before driving to the Walmart store across the street. A receipt shows Carol checked out at Walmart at 11:10 a.m. after having purchased copy paper, poster frames, blue jeans, and magazine holders. Before returning home, Carol drove to other stores. Her last stop was a grocery store, where she purchased perishable items. She checked out at 2:03 p.m. and headed home. Carol testified she was home by 2:16 p.m., but she had previously told officers she arrived home around 3 p.m. When Carol arrived home, she noticed plaintiff's car in the driveway. Carol awoke plaintiff for dinner at approximately 6 p.m.

¶ 37 Freesmeyer testified regarding road tests he performed to test plaintiff's opportunity to murder Lockmiller. According to Freesmeyer, the distance between plaintiff's bank and Lockmiller's apartment was 126.7 miles. Freesmeyer's test indicated plaintiff, having left his bank at 10:11 a.m., could have arrived at Lockmiller's apartment before noon if plaintiff drove 10 miles per hour over the speed limit. Freesmeyer further testified 139.7 miles separated the Beaman residence and Lockmiller's apartment. He averred plaintiff could have made that trip in just under two hours if he drove at a speed 10 miles per hour over the posted limit.

¶ 38 Freesmeyer performed a road test from plaintiff's bank to the Beaman residence to see if it was possible to make the phone call from the Beaman residence at 10:37 a.m. He testified he drove through downtown Rockford, the "most direct route," obeyed all speed limits, and concluded it took 31 minutes to make the trip. Freesmeyer concluded plaintiff would have arrived home at 10:42 a.m. Freesmeyer testified it took him 15 minutes to drive from the Beaman residence to the Walmart where Carol shopped on August 25. On cross-examination, Freesmeyer acknowledged plaintiff did not state he drove through downtown Rockford on August 25. Freesmeyer also agreed the route he took was through downtown Rockford and not on "the high speed bypass" around the city.

¶ 39 In rebuttal argument, the State argued all of the other possible suspects were excluded due to alibis: "Did we look at Mr. Swaine? You bet we did. Did we look at [Gates]? You bet we did. Did we look at a lot of people and interview a lot of witnesses? You bet we did. And guess who sits in the courtroom *** with the gap in his alibi still unclosed even after all this?"

¶ 40 On April 1, 1995, the jury found plaintiff guilty of first degree murder. He was sentenced to 50 years' imprisonment. On direct appeal, a majority affirmed plaintiff's conviction. *People v. Beaman*, No. 4-95-0396 (1996) (unpublished order under Illinois Supreme Court Rule 23).

¶ 41 By letter dated April 17, 1995, Souk wrote to Normal Police Chief James Taylor, commending Freesmeyer for his work on the case. The letter stated as follows:

> "I would be derelict in my duties if I did not write you a separate letter concerning Tim Freesmeyer's performance in the Beaman case.

Rather than elaborate on the details, I will simply tell you that Tim's work on this case is the single finest effort by any police officer in any case with which I have been involved during 20 years as both a prosecutor and defense lawyer.

The effort is all the more remarkable considering his relative youth and inexperience. His recent promotion indicates you are already aware of his exceptional ability, but I would not be comfortable without expressing to you officially my great admiration for Tim, both as a person and a police officer. Beyond any question in my mind, this case would not have been won without Tim Freesmeyer."

¶ 42                    E. Proceedings on Plaintiff's Petition for Postconviction Relief

¶ 43    In April 1997, plaintiff filed a petition for postconviction relief. Later, several amendments were made to the petition. In its final form, plaintiff alleged, in part, the State violated his right to due process by failing to disclose material information regarding Murray's viability as a suspect. An evidentiary hearing was held on plaintiff's petition.

¶ 44    At the evidentiary hearing on plaintiff's postconviction claims, Daniels testified he believed Murray was and continued to be a viable suspect. Murray was Lockmiller's former boyfriend, and according to Murray, the two were about to rekindle their romance. Daniels testified Murray provided Lockmiller with drugs and she owed him money. Murray lived a short distance from Lockmiller's apartment. Murray visited Lockmiller a few days before the murder but found her with Swaine. Daniels further testified Murray was asked to take a polygraph examination. The examination could not be completed because Murray was not cooperative. Murray was asked to complete a second polygraph examination, and he agreed. The examination, however, did not occur.

¶ 45    At the hearing, the polygraph examiner also testified. He opined the lack of cooperativeness could have been intentional.

¶ 46    The circuit court denied plaintiff postconviction relief. This court, with Justice Cook dissenting, affirmed the denial. *People v. Beaman*, 368 Ill. App. 3d 759, 772, 858 N.E.2d 78, 91 (2006).

¶ 47    In 2008, the Supreme Court of Illinois found the State violated plaintiff's constitutional right to due process of law when it failed to disclose the evidence related to Murray and reversed the circuit court order denying his postconviction petition. *Beaman*, 229 Ill. 2d at 81-82. The Court summarized the undisclosed evidence as consisting of four points: "(1) [Murray] failed to complete the polygraph examination; (2) [Murray] was charged with domestic battery and possession of marijuana with intent to deliver prior to [plaintiff's] trial; (3) [Murray] had physically abused his girlfriend on numerous prior occasions; and (4) [Murray's] use of steroids had caused him to act erratically." *Id.* at 74. The court concluded the State's case against plaintiff "was not particularly strong" and "tenuous," supporting the admission by plaintiff "of the similarly probative alternative suspect evidence on" Murray. *Id.* at 77-78. The court had no "confidence in the verdict finding petitioner guilty of this crime given the tenuous nature of the circumstantial evidence against him, along with the nondisclosure of critical evidence that would have countered the State's argument that all other potential suspects had been eliminated from consideration." *Id.* at 81.

¶ 48    Plaintiff's conviction was vacated and remanded. The State declined to reprosecute plaintiff and dismissed the charges against him. Plaintiff was released from prison in June

2008, and the State of Illinois, in April 2013, certified his innocence. *Beaman v. Freesmeyer*, 776 F.3d 500, 504 (7th Cir. 2015). The Governor of Illinois pardoned plaintiff "based upon innocence as if no conviction."

### F. Plaintiff's Federal Civil Suit

¶ 50    In January 2010, plaintiff filed a section 1983 complaint (42 U.S.C. § 1983 (2006)) against defendants Freesmeyer, Warner, and Zayas, as well as against Souk, Reynard, and other detectives. Plaintiff alleged three federal claims: defendants acting individually and in conspiracy withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (individual liability), defendants conspired to deprive plaintiff of exculpatory evidence (conspiracy liability), and defendants failed to intervene to prevent violation of his rights. *Beaman*, 776 F.3d at 505. Plaintiff included state law claims for malicious prosecution, civil conspiracy, and intentional infliction of emotional distress against the Town of Normal. *Id.*

¶ 51    The claims against Souk and Reynard were dismissed based on absolute immunity or qualified immunity. *Id.* at 506. The claims against the other detectives, individuals who are not named defendants in this case, were dismissed after discovery revealed those detectives were not involved in the suppression of evidence. *Id.*

¶ 52    The district court granted summary judgment on the federal claims to the remaining defendants—Freesmeyer, Warner, and Zayas—and the Seventh Circuit affirmed. The court found insufficient evidence from which a jury could infer an agreement between the defendants to withhold the Murray evidence. *Id.* at 513. The Seventh Circuit concluded "[t]he defendants did not falsify any physical evidence or use any knowingly false testimony at trial." *Id.* at 512. As to Freesmeyer, the Seventh Circuit discounted plaintiff's argument Freesmeyer prepared a "deceptive" police report regarding the time trials. The court found "Freesmeyer did not lie about the speeds at which he drove, and he was subject to cross-examination at trial about the speeds and alternative routes." *Id.* The court observed "[t]his is the type of behavior that will be present in every criminal prosecution—valid pursuit of a conviction." *Id.* The court also found "the defendants are entitled to qualified immunity for their failure to turn over the Murray polygraph report to the prosecution and Beaman's defense counsel." *Id.* at 510. The court did so after framing the question as to whether *inadmissible* information inculpating another suspect could be *Brady* material. *Id.* The court observed "[i]t is clear that Beaman's primary quarrel is with Souk. Souk possessed (most of) the Murray evidence, failed to turn it over, and told the court and jury that there were no alternative suspects." *Id.* at 513. Neither the district court nor the Seventh Circuit addressed the state-law claims of malicious prosecution, intentional infliction of emotional distress, or conspiracy against the Town of Normal for lack of jurisdiction. *Id.* at 506.

### G. Plaintiff's State Civil Lawsuit

¶ 54    In April 2014, plaintiff filed this action against defendants Freesmeyer, Warner, Zayas, and the Town of Normal. The complaint contains five claims: (1) malicious prosecution, (2) intentional infliction of emotional distress, (3) civil conspiracy, (4) *respondeat superior*, and (5) indemnification. In his complaint, plaintiff asserted the three individual defendants played significant roles in his prosecution and wrongful conviction.

¶ 55    Plaintiff asserted Freesmeyer "advocated for, approved, and physically effected" his arrest. Plaintiff alleged Freesmeyer moved into an office in the state's attorney's office to work full-

time on plaintiff's case and decided, on the first day of the investigation, plaintiff was "the primary suspect." Freesmeyer did so, according to plaintiff, even though the crime scene suggested the murderer was "a perpetrator of considerable size and power," while "plaintiff was thin and small," and Lockmiller's drug use and "behavior" pointed to a number of other possible suspects and "unsavory characters." Plaintiff identified Murray as the most significant suspect in that he was a drug dealer and Lockmiller's "sex partner" who used steroids and cocaine, beat women, and lied about his alibi.

¶ 56    Other evidence plaintiff pointed to includes allegations Freesmeyer had a "continued fixation on plaintiff despite [a] lack of evidence." Plaintiff argued the evidence showed Freesmeyer, and other detectives, did not investigate area burglaries or sexual assaults, did not interview individuals with whom Lockmiller had been in contact before her murder, and failed to listen to other detectives "who questioned their singular fixation." Plaintiff maintained Freesmeyer doctored the time trials to secure plaintiff's conviction, thereby "creat[ing] evidence" plaintiff did not make the calls from the Beaman residence by driving within the speed limit and using the downtown route and not the bypass route favored by Rockford locals. Freesmeyer further avoided telling the jury about his testing the bypass route and finding, had plaintiff used the bypass route, he could have made those calls. In contrast, when attempting to establish plaintiff could have made the trip to Normal, Freesmeyer drove over the speed limit. Plaintiff highlighted evidence Freesmeyer threatened the death penalty during an interview of plaintiff and Freesmeyer's repeated efforts to secretly tape inculpatory statements from him.

¶ 57    As to Warner, plaintiff alleged he was liable to plaintiff for damages as a result of burying a report regarding Murray's polygraph. The report of the incomplete polygraph was addressed to Warner. Warner averred he gave the report to Daniels, but Daniels had no memory of receiving it. The state's attorney's office did not receive a copy. According to the report, Murray denied strangling Lockmiller and denied knowing who did. The report, however, was inconclusive given Murray's failure to comply with specific directions:

> "Throughout the course of this polygraph examination, the subject did not follow specific directions given to him which are necessary for the proper completion of a polygraph examination. After being advised several times to follow directions, the subject informed this examiner that he was not able to comply. Subsequently, the subject was dismissed from this laboratory."

¶ 58    Defendants moved for summary judgment on plaintiff's claims. Defendants maintained there was no evidence establishing a genuine issue of material fact on four of the five elements of his malicious-prosecution claim. Defendants contended, as a result, they were entitled to judgment on the malicious-prosecution claim and the remaining claims, which plaintiff predicated on the contention he was maliciously prosecuted.

¶ 59                            H. Summary Judgment Order

¶ 60    In June 2016, the trial court granted defendants' motion for summary judgment. After listing the elements for the claim of malicious prosecution, the court found the prosecutors who handled the case, not the defendant officers, decided to prosecute plaintiff. In support, the court highlighted Daniels's deposition testimony. The court pointed to Daniels's statement that, during the May 1994 meeting with investigating officers and lead prosecutors, Souk rejected Daniels's suggestions to investigate other avenues. Souk expressed the investigation was

complete and an arrest warrant would be issued for plaintiff. The court explicitly found defendants "did not exert any unusual influence on the prosecutors which caused a malicious prosecution to take place against plaintiff."

¶ 61    The trial court further found no genuine issue of material fact as to the remaining malicious-prosecution elements and to plaintiff's claims of intentional infliction of emotional distress, conspiracy, *respondeat superior*, and indemnification.

¶ 62                    I. Plaintiff's Appeal of the Summary Judgment Order

¶ 63    Plaintiff appealed the order. In his appeal, plaintiff challenged the trial court's order, maintaining the evidence showed a genuine issue of material fact to each of the elements of malicious prosecution. Plaintiff argued all of his claims were improperly dismissed.

¶ 64    In our opinion, we affirmed the order for summary judgment. We began our analysis by setting forth the elements of a malicious-prosecution claim in Illinois:

> "Under Illinois law, a claim of malicious prosecution requires proof of each of the following elements: '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant[s]; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.' " *Beaman v. Freesmeyer*, 2017 IL App (4th) 160527, ¶ 49 (quoting *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996)).

¶ 65    We then considered whether, in viewing the evidence in the light most favorable to plaintiff, defendants showed no genuine issue of material fact on the first element of that offense: " 'the commencement or continuance of an original criminal or civil judicial proceeding by the defendant[s].' " *Id.* ¶ 50 (quoting *Swick*, 169 Ill. 2d at 512). On that issue, plaintiff, in a little over four pages, asserted he sufficiently established the element by simply showing the defendants had "significant involvement" in the commencement or continuance of his prosecution. Plaintiff did not mention proximate cause, only asserting (1) the conviction would not have occurred *but for* the conduct of the defendant officers and (2) the officers, one of whom worked out of the office of the State's Attorney, had significant roles in the prosecution. We questioned the approach of limiting consideration of the commencement element to only the significance of one's role in instituting the prosecution. *Id.* ¶ 54.

¶ 66    Turning to defendants' brief for guidance, we found defendants argued proof of the element required a causal link, like undue influence, on the prosecutor's decision to commence suit. We disagreed the question should be limited to only instances of "undue influence." *Id.* ¶ 55. Instead, to resolve the question of whether the commenced-or-continued element was sufficiently satisfied, we relied upon a recent decision by the Seventh Circuit Court of Appeals, *Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017), which held the chain of causation in a malicious-prosecution action will be broken by a prosecutor's indictment absent " ' "an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor." ' " *Beaman*, 2017 IL App (4th) 160527, ¶ 57 (quoting *Colbert*, 851 F.3d at 655, quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). We analyzed the evidence presented and concluded no genuine issue of material fact existed on this element, as there was no evidence showing the defendants pressured or influenced Souk's decision to prosecute plaintiff and no evidence of knowing misstatements by the defendants to Souk. *Id.* ¶¶ 65, 69, 72. We, therefore, concluded the chain of causation was broken. We

affirmed the trial court's order. *Id.* ¶ 80. Plaintiff appealed.

¶ 67                    J. Illinois Supreme Court's Reversal

¶ 68    Before the Supreme Court of Illinois, the parties more fully addressed the issue of the proper considerations of the commencement-or-continuance element of malicious prosecution. In addition to the parties' briefs, the court allowed the filing of multiple *amici* briefs by former state and federal prosecutors, police unions, and cities (Peoria and Chicago).

¶ 69    The court summarized three approaches in Illinois case law for analysis of this element: "significant role"; "advice and cooperation"; and "pressure, influence, or misstatement" tests. See *Beaman*, 2019 IL 122654, ¶¶ 29-31. The court agreed with defendants that all steps require proof of causation and concluded "the relevant inquiry is whether the officer proximately caused the commencement or continuance of the criminal proceeding." *Id.* ¶ 33. The court then articulated the "significant role" assessment should be used to ascertain proximate cause and defined it as follows:

> "This significant role assessment necessarily includes those persons whose participation in the criminal case was so 'active and positive' to 'amount to advice and co-operation' [(*Gilbert v. Emmons*, 42 Ill. 143, 147 (1866))] or those persons who 'improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution (52 Am. Jur. 2d *Malicious Prosecution* § 88 (2018))." *Id.* ¶ 45.

¶ 70    The supreme court remanded this case, ordering this court to "examine whether the defendants' conduct or actions proximately caused the commencement or continuance of the original criminal proceeding by determining whether defendants played a significant role in [plaintiff's] prosecution." *Id.* ¶ 47.

¶ 71                               II. ANALYSIS
¶ 72                          A. Summary Judgment Standards
¶ 73    When considering a motion for summary judgment, the court's role is to ascertain whether a genuine issue of material fact exists and not to resolve factual questions. *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 8 (2008). A court should grant such a motion only when the depositions, pleadings, affidavits, and admissions, viewed in the light most favorable to the nonmovant, show both no genuine issue of material fact and the movant is, as a matter of law, entitled to judgment. *Pontiac National Bank v. Vales*, 2013 IL App (4th) 111088, ¶ 29, 993 N.E.2d 463 (citing 735 ILCS 5/2-1005(c) (West 2008)). Because summary judgment is a drastic means to resolve a case, a trial court should grant summary judgment only when the moving party's right to judgment is clear and free from doubt. *Vales*, 2013 IL App (4th) 111088, ¶ 29. When reasonable persons can " 'draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact.' " *Beaman*, 2019 IL 122654, ¶ 22 (quoting *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114, 649 N.E.2d 1323, 1326 (1995)). On appeal, we review summary judgment orders *de novo*. *Rettig v. Heiser*, 2013 IL App (4th) 120985, ¶ 30, 996 N.E.2d 1220.

¶ 74                                  B. Malicious Prosecution

¶ 75        As stated above, to establish a claim of malicious prosecution, a plaintiff must prove each
of the following elements: "(1) the commencement or continuance of an original criminal or
civil judicial proceeding by the defendant[s]; (2) the termination of the proceeding in favor of
the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice;
and (5) damages resulting to the plaintiff." *Swick*, 169 Ill. 2d at 512. The failure to prove one
element prevents recovery on the claim. *Id.*

¶ 76                                        1. Probable Cause

¶ 77        The existence of probable cause is a complete defense to a claim of malicious prosecution,
no matter the motive prompting the arrest. *Ely v. National Super Markets, Inc.*, 149 Ill. App.
3d 752, 758, 500 N.E.2d 120, 125 (1986). Probable cause, for purposes of an action for
malicious prosecution, is defined as a state of facts, in the prosecutor's mind, that would lead
a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion
the person arrested is guilty of the offense for which he was arrested. *Frye v. O'Neill*, 166 Ill.
App. 3d 963, 975, 520 N.E.2d 1233, 1241 (1988); see also *Fabiano v. City of Palos Hills*, 336
Ill. App. 3d 635, 642, 784 N.E.2d 258, 266 (2002) ("Probable cause is a state of facts that
would lead a person of ordinary care and prudence to believe or to entertain an honest and
sound suspicion that the accused committed the offense charged."). "Whether the relevant
facts, viewed in the light most favorable to the plaintiff, constitute probable cause for
instituting a criminal prosecution is a question of law which the court must determine." *Frye*,
166 Ill. App. 3d at 976; see also *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL
113907, ¶ 63, 983 N.E.2d 993 (noting "the existence of probable cause is a question of law and
only becomes a question of fact if the operative facts are in dispute"). In assessing whether
probable cause exists, we examine the totality of the circumstances at the time of the arrest.
*Gauger v. Hendle*, 2011 IL App (2d) 100316, ¶ 112, 954 N.E.2d 307, 329.

¶ 78        Defendants contend the existence of probable cause for plaintiff's arrest is another
meritorious basis to affirm the award of summary judgment. Defendants argue the totality of
the circumstances shows no genuine issue of material fact as to the existence of probable cause.
Defendants point to plaintiff and Lockmiller's tumultuous relationship, which included
outbursts overheard by neighbors; Lockmiller's expressed fear of plaintiff; plaintiff's love
letters and threats of suicide; plaintiff's behavior in following Swaine and kicking down
Lockmiller's door; the existence of two of plaintiff's fingerprints on the murder weapon; a
plastic garbage bag lying on the couch in the living room, a circumstance reminiscent of the
time plaintiff searched the trash for used condoms; the lack of signs of a forced entry; the fact
Lockmiller began a relationship with Swaine, plaintiff's roommate; and the timeline, albeit
narrow, indicating plaintiff had time to murder Lockmiller and return to Rockford.

¶ 79        Plaintiff concedes the parties "agree on some of the facts" but contends the proper
inferences to be drawn from those facts must be viewed in the light most favorable to the
nonmovant. We note plaintiff does not dispute defendants' assertion of facts from plaintiff's
mother's testimony, testimony that narrowed the window of the time when he could have
committed the crime, were not known until after the case was turned over to prosecutors.

¶ 80        Plaintiff argues, however, a reasonable juror could find probable cause wanting based on
the divergent inferences that could be drawn from them. Plaintiff lists the following reasons in
support: (1) no probative physical evidence against plaintiff exists; (2) no one could place

                                              - 14 -

plaintiff in town when the murder occurred; (3) plaintiff maintained his innocence during the investigation, which included "overhears"; (4) any number of men could have committed the crime; (5) Singley's statement indicates the murder occurred after 2 p.m., eliminating any possibility plaintiff murdered Lockmiller; (6) plaintiff was in Rockford, 130 miles from Bloomington, at 10:11 a.m. on the morning of the murder; (7) the crime scene indicated the killer was a stranger, as the trash bag having been pulled from the trash can indicates a burglar and a larger and more powerful man; (8) the evidence against Murray was stronger, as Murray lived near Lockmiller, had a history of domestic violence, and was a drug dealer to whom Lockmiller owed money; (9) the fingerprint evidence was weak, as plaintiff had stayed overnight at Lockmiller's apartment regularly when they were dating and he used the alarm clock; (10) the love letters were old, and plaintiff ended the relationship; (11) plaintiff did not return the many phone calls Lockmiller made to him before the murder; (12) the timeline was literally impossible; (13) the incidents of violence, *e.g.*, kicking down the door and punching walls, were not inflicted on people; (14) the evidence of the fan on Lockmiller's head was indicative of a burglary; and (15) the use of scissors for the murder indicates the killer did not know Lockmiller.

¶ 81 We acknowledge plaintiff has an explanation for each fact, but our review of probable cause focuses not on individual facts but on the totality of the circumstances. Viewing the totality of the circumstances, and doing so in the light most favorable to plaintiff, we find no genuine issue of material fact on the existence of probable cause. The facts are such that, in the prosecutor's mind, a person of ordinary caution and prudence would be led to believe or entertain an honest and strong suspicion plaintiff was guilty. Summary judgment for defendants was proper.

¶ 82 In addition to this analysis of the points raised by plaintiff, we also conclude plaintiff could never successfully meet his burden of showing probable cause did not exist. The trial court denied plaintiff's motion for a directed verdict at his trial for first degree murder. The jury convicted him. This court affirmed plaintiff's conviction and rejected his claim the State's evidence was not sufficient to support his conviction. No court, in the multiple reviews of his convictions, has ever deemed the evidence against him insufficient to sustain his conviction— quite the opposite.

¶ 83 In *Beaman*, 229 Ill. 2d at 56, the supreme court reversed plaintiff's conviction on the sole ground he was entitled to a new trial due to a *Brady* violation but added:

> "As a final matter, we note that on direct appeal the appellate court held the evidence was sufficient to convict petitioner of this offense. Petitioner does not raise any claim based on the sufficiency of the evidence in this court. Accordingly, there is no double jeopardy impediment to a new trial." *Id.* at 82.

¶ 84                                  2. Commencement or Continuance Element

¶ 85 To be sure we have fully complied with the remand from the supreme court, we choose to address plaintiff's additional arguments despite our conclusion plaintiff cannot show an absence of probable cause. Our interpretation of the court's decision in *Beaman* is that, to ascertain whether the defendants commenced or continued an original criminal or judicial proceeding against plaintiff, we must consider whether the role of defendants was significant. The court states persons whose roles are significant include those

"whose participation in the criminal case was so active and positive to amount to advice and co-operation [citation] or those persons who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution." (Internal quotation marks omitted.) *Beaman*, 2019 IL 122654, ¶ 45.

¶ 86    The parties dispute the manner by which these considerations must be undertaken. Defendants contend that, however one characterizes the officers' conduct, a plaintiff must overcome the presumption of the prosecutor's independent judgment *before* one can establish a person proximately caused malicious prosecution. In support, defendants quote the court's language directly preceding the paragraph in which the court set forth the significant-role assessment:

" 'Liability thus depends on whether the defendant was actively instrumental in causing the prosecution, and the presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution.' " *Id.* ¶ 44 (quoting 52 Am. Jur. 2d *Malicious Prosecution* § 88 (2018)).

¶ 87    Plaintiff contends such an interpretation of *Beaman* would, in effect, be an improper attempt by this court to reverse the supreme court's decision. Plaintiff contends the supreme court rejected the conclusion the prosecutor's decision could insulate defendants when it reversed our decision to affirm summary judgment upon finding a plaintiff may establish the commencement-and-continuance element by showing the officer pressured or exerted influence on the prosecutor's decision or made knowing misstatements to the prosecutor. Relying on that holding, plaintiff argues all he must show is a rational juror could find the police officers " 'concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution.' " *Id.* ¶ 45 (quoting 52 Am. Jur. 2d *Malicious Prosecution* § 88 (2018)). Plaintiff then maintains "significant role," and thus proximate cause, is satisfied with proof of bad-faith conduct or concealed exculpatory evidence.

¶ 88    We do not agree with plaintiff that to accept defendant's contentions regarding prosecutorial independence would be an attempt by this court to reverse the holding of *Beaman*. The supreme court's holding in *Beaman* is that our review of defendants' conduct was too narrow, finding error in the decision to focus on whether the officers pressured or unduly influenced the prosecutor or whether the officers made false representations. The supreme court held the standard employed failed to acknowledge a person may be liable for malicious prosecution even if that person did not "actively deceive prosecutors." *Id.* ¶ 43. The *Beaman* court did not hold this court erred by examining whether the officers' conduct proximately caused the decision to prosecute plaintiff.

¶ 89    Our review of *Beaman* establishes proximate cause is not established absent proof of conduct that overcomes the presumption of prosecutorial independence. It is not enough for a plaintiff seeking relief for malicious prosecution to establish an officer acted in bad faith or performed a wrongful act. That plaintiff must still establish legal causation. *Beaman* says as much. As we stated above, *Beaman* defines when a person falls within the "significant role" standard:

- 16 -

"This significant[-]role assessment necessarily includes those persons whose participation in the criminal case was so active and positive to amount to advice and co-operation [citation] or those persons who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution (52 Am. Jur. 2d *Malicious Prosecution* § 88 (2018))." (Internal quotation marks omitted.) *Id.* ¶ 45.

In the paragraph directly preceding this pronouncement, the court cites the same section of *Malicious Prosecution* and states the following:

" 'Liability thus depends on whether the defendant was actively instrumental in causing the prosecution, and the presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution.' 52 Am. Jur. 2d *Malicious Prosecution* § 88 (2018)." *Id.* ¶ 44.

¶ 90    Because the supreme court used the same language from the same source it cited a paragraph earlier, it is clear the supreme court plainly intended proximate cause cannot be established absent proof the wrongful or bad-faith conduct overcame prosecutorial independence. A prosecutor's decision to commence or continue suit breaks the causal chain, absent some conduct, as defined in the significant-role assessment, on behalf of an officer.

¶ 91    Plaintiff next argues a reasonable juror could find defendants played a significant role in the commencement or continuation of his prosecution, as the participation in the criminal case was so "active and positive" to amount to advice and cooperation. Plaintiff emphasizes that, in the meeting in which all of the defendants reached a "consensus" with Reynard and Souk, no doubt was expressed in arresting plaintiff, and no one objected to the arrest. Plaintiff further points to the multiple occasions, which "could have" been as many as 50, during which Souk and Freesmeyer discussed the investigation.

¶ 92    This test is cited by the *Beaman* court as part of the significant-role, proximate-cause assessment. The source of the advice-and-cooperation test is an 1866 case, *Gilbert v. Emmons*, 42 Ill. 143 (1866), involving private citizens. In *Gilbert*, the plaintiff sued defendants Palmer and Gilbert, who were partners in a firm from which money had been stolen. *Id.* at 146. The warrant that was issued was made by Palmer. *Id.* The court reasoned Gilbert would be equally responsible as Palmer if he advised the arrest—if he directly participated in causing the arrest or advised the arrest be made. *Id.* Gilbert's consent to the arrest was insufficient unless it was "so active and positive a character as to amount to advice and co-operation." *Id.* at 147.

¶ 93    We find consideration of the test espoused in *Gilbert* does not establish the officers proximately caused plaintiff's prosecution. As plaintiff asserts in his reply brief filed in the supreme court, *Gilbert* "has never applied the test to a police officer (or to any defendant since *Gilbert*)." For good reason, as the *Beaman* court recognizes "prosecutors ordinarily rely on police and other agencies to investigate criminal acts." *Beaman*, 2019 IL 122654, ¶ 43 (citing *People v. Ringland*, 2017 IL 119484, ¶ 24, 89 N.E.3d 735 (also observing state's attorneys defer to the investigative duties of the police)). Unlike in relationships between private citizens and prosecutors and private citizens and police (*e.g.*, *Gilbert*), the relationship between police and prosecutors on investigative matters routinely involves "advice and cooperation." It would

be contrary to public policy and incongruous to ask officers and prosecutors to cooperate and work together and yet take officers to trial for doing just that.

¶ 94   We turn to the remaining assessments to ascertain whether a reasonable juror could find defendants, individually, "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution" and whether such conduct is the proximate cause of the commencement or continuation of plaintiff's prosecution.

¶ 95   *a. Defendant Freesmeyer*

¶ 96   In asserting sufficient evidence exists for a jury question on the "commenced or continued" element in his claim against Freesmeyer, plaintiff contends Freesmeyer targeted plaintiff since "Day One," led a biased investigation, lied to the grand jury, doctored time trials, omitted exculpatory evidence from his police reports, threatened plaintiff with the death penalty, moved into the prosecutor's office, and gave misleading trial testimony. Plaintiff contends these actions by Freesmeyer could lead a reasonable juror to find Freesmeyer commenced or continued his prosecution.

¶ 97   We further disagree with plaintiff's statement a reasonable juror could find Freesmeyer lied to the grand jury about his interview with Singley. Plaintiff contends Freesmeyer, ignoring Singley's statements, told the grand jury no helpful information had been learned from Lockmiller's neighbors during the investigation when Singley's interview helped rule out plaintiff as a suspect. Freesmeyer's statement is a conclusion he did not find the information helpful:

> "Q. Without going into individual details, were the other residents of the apartment building shortly after the discovery of the body, in the next few days, questioned extensively?
>
> A. Yes. ***
>
> Q. Would it be a fair summary of those interviews that all of them produced no eyewitnesses to the crime and no information that turned out [to] be particularly helpful in the investigation?
>
> A. That's correct."

Testimony from plaintiff's trial shows Freesmeyer identified a reason he "discount[ed] Singley's observations as being inaccurate:

> "Well, first of all, nobody could pick out Mr. Swaine's vehicle from the photos we showed them. Second of all, Mr. Singley stated he heard the door, the same door open and close on Friday as he did on Wednesday, and everybody on the team was in agreement that Ms. Lockmiller was deceased long before Friday. And also he stated he saw Swaine's vehicle there on Wednesday, and I'd already spoken with Ms. Betteridge from Elmhurst. She stated that Mr. Swaine was at her side until 3:15 that day. There was absolutely no way that that car could have been in Normal on Wednesday."

¶ 98   First, despite the repeated references to a "biased investigation" in plaintiff's appellant brief and the former prosecutors' *amicus* brief, no language in the supreme court's *Beaman* decision supports the expansion of the malicious-prosecution torts to acts of "bias." As the *Beaman* court acknowledged, because public policy favors the exposure of crime, malicious-

prosecution actions are disfavored. *Beaman*, 2019 IL 122654, ¶ 24. To expand the tort to allow actions against "biased" private citizens and police officers would contravene the aforementioned public policy. We will not expand the tort to include "bias."

¶ 99    We note "bias" does not equate to "bad faith" conduct. Bias is defined as "an inclination of temperament or outlook" and "a personal and sometimes unreasoned judgment." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/bias (last visited Dec. 9, 2019) [https://perma.cc/Q6JX-9E9L]. Black's Law Dictionary defines "bad faith" as follows:

> "The opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term 'bad faith' is not simply bad judgment or negligence but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed. 1990).

Bias will be actionable only if it culminates into conduct, such as bad-faith conduct, that satisfies the elements of a malicious-prosecution claim.

¶ 100    Turning to the assessments set forth in *Beaman*, we find there are no facts from which a reasonable juror could infer Freesmeyer pressured or exerted influence on Souk's decision to prosecute plaintiff. The evidence shows Souk believed plaintiff was the "only" or primary suspect within one day of the discovery of decedent's body. The evidence shows the prosecutors, Reynard and Souk, made the decision to prosecute plaintiff. No witness testimony contradicts this conclusion. As the trial court concluded, testimony of Daniels shows Souk, during the May 1994 meeting, refused to consider additional evidence and decided it was time to prosecute plaintiff. Plaintiff contends it was error to focus on Daniels's statement. Plaintiff points to Freesmeyer's deposition testimony in which he did not recall anyone expressing doubt in arresting plaintiff and contends, taking the evidence in the light most favorable to plaintiff, we must accept Freesmeyer's account. Even accepting Freesmeyer's account on whether Daniels objected to the arrest of plaintiff or not, no evidence suggests anyone other than the prosecutor made the decision to prosecute plaintiff and then did so.

¶ 101    We turn to the question of whether a reasonable juror could find Freesmeyer provided false information to Souk or Reynard to influence the commencement or continuation of plaintiff's prosecution. Plaintiff identifies two types of evidence that were allegedly fabricated: the time trials and Freesmeyer's testimony before the grand jury. This evidence, however, does not support plaintiff's conclusion the element is satisfied. Initially, there is no proof in the record Freesmeyer tainted or falsely reported the time trials. Indeed, the Seventh Circuit examined similar allegations against Freesmeyer and found "Freesmeyer did not lie ***." *Beaman*, 776 F.3d at 512. Similar to the Seventh Circuit's findings, we find Freesmeyer's efforts were to show plaintiff's conduct could have fit within the State's theory of the case. "This is the type of behavior that will be present in every criminal prosecution—valid pursuit of a conviction." *Id.*

¶ 102    On remand, plaintiff contends our conclusion regarding Freesmeyer's time-trial testimony is incorrect, as it ignores the fact Freesmeyer did not disclose in his reports the fact he performed a time trial that had a result favorable to plaintiff. Specifically, plaintiff emphasizes

the results from all but one test appear in his reports, implying Freesmeyer concealed the result that would have shown plaintiff had time to leave Bell Federal, use the bypass route around Rockford, and be home in time to make the 10:37 a.m. and 10:39 a.m. calls.

¶ 103    There is good reason this court did not address this nondisclosure in Freesmeyer's reports—plaintiff did not raise this argument in the commencement-or-continuation argument section in his initial brief before this court. Plaintiff, in one sentence in his original statement of facts, reported "Freesmeyer proceeded to omit mention of that trial from his police report and avoided telling the jury that fact during his testimony at trial." However, no reasonable juror could find this nondisclosure is the proximate cause of the commencement or continuation of plaintiff's prosecution. The undisputed facts, and any reasonable inference therefrom, show the presumption of prosecutorial independence (*Beaman*, 2019 IL 122654, ¶ 44) cannot be overcome by this conduct. Souk, who made the decision to prosecute, knew this fact. Freesmeyer disclosed it before the grand jury after Souk questioned him about the bypass route:

"Q. Now did you also on two occasions do the same kind of timing from Bell Federal to the Beaman residence?

A. Yes, I did.

Q. On one of those occasions, did you basically drive it through town?

A. I drove the most direct route and I also drove what I thought to be the fastest route, the two most logical ways to get to the Beaman residence from Bell Federal.

Q. On both those occasions, did you drive the speed limit?

A. Yes. The trip through town, I drove the speed limit[,] and I drove it on a Wednesday afternoon at approximately 10:00 ***, so it would be very comparable to the time that Mr. Beaman would have driven that route.

Q. How long did that trip take going through town?

A. That trip took me 30 minutes. If he had left the bank at 11 minutes after 10:00, he'd [have] gotten home at 10:45. The calls were made at 10:37 and 10:39.

Q. When you drove it the other way, did you—from Bell Federal, if you go a couple miles south, do you get to this Route 20 going around the south side of town?

A. Yes, Bell Federal is on the corner of Newburg and Alpine. If you take Alpine straight south to 20 and around, that would be probably the quickest route to Mr. Beaman's residence, and that took me 25 minutes. So once again 25 added to the 10:11 would put me there at 10:36. The calls were at 10:37 and 10:39."

¶ 104    Freesmeyer did not conceal this information from Souk. The failure to include the information in the police report could not have proximately caused or continued Souk's decision to prosecute. In addition, we note there is no evidence Freesmeyer avoided telling the jury of this fact at plaintiff's trial. Freesmeyer was questioned and cross-examined about the time trials. He did not lie. He was not asked the right questions. Indeed, as counsel noted during defendant's appeal from the denial of his postconviction petition, "[b]ecause drive times were 'not really' the focus of his defense, defense counsel stated he conducted 'minimal cross-examination' of Freesmeyer with respect to drive times between the bank and the Beaman residence." *Beaman*, 368 Ill. App. 3d at 771, *rev'd*, 229 Ill. 2d 56.

¶ 105    We further find no reasonable juror could find Freesmeyer lied by, as plaintiff states in his brief, telling the jury he was unable "to locate any other person anywhere who had any

- 20 -

conceivable motive to kill Jennifer Lockmiller." Freesmeyer did not say those words. In fact, he qualified his answer, "No, not necessarily." Souk, who was questioning Freesmeyer at the time, guided the testimony and did not ask Freesmeyer what he meant by "not necessarily." Instead, Souk began questioning Freesmeyer about another suspect, Swaine. Souk did not ask Freesmeyer an open question. Souk did not ask about Murray.

¶ 106    Plaintiff points to no other wrongful or bad-faith conduct by Freesmeyer. We affirm the order granting summary judgment to Freesmeyer, as there are no disputed facts, or reasonable inferences therefrom, that may establish Freesmeyer is proximately liable for the commencement or continuation of plaintiff's prosecution.

¶ 107                                    b. *Detective Warner*

¶ 108    Regarding Warner, plaintiff contends a genuine issue of material fact exists as to whether Warner played a significant role in commencing or continuing the prosecution of him when he buried the Murray polygraph report, a report he asserts both the Northern District of Illinois and the Supreme Court of Illinois found to be "material and exculpatory." In his role in the investigation, Warner was to ensure Zayas received a copy of the report, submit the report for record keeping, and disseminate copies to the investigators working on the case. Plaintiff's contention the evidence is sufficient to create a genuine issue of material fact on the commenced-or-continued element is predicated on the fact Warner's role was significant and the record was material to the case.

¶ 109    We find the evidence does not create a genuine issue of material fact on the question of whether Warner commenced or continued the prosecution as a result of pressure on the prosecutor or the provision of false information. There is no evidence from which a jury could reasonably infer Warner encouraged or exerted pressure on Souk to prosecute. There is also no evidence from which a jury could reasonably infer Warner knowingly provided Souk false information.

¶ 110    However, there is a question of genuine issue of material fact on whether Warner intentionally concealed the incomplete polygraph report from prosecutors. A jury could conclude the failure to turn over the report to the prosecutor was a negligent mistake. Or a jury could conclude Warner, who undisputedly had the polygraph report in his possession, intentionally withheld it. *Beaman v. Souk*, 7 F. Supp. 3d 805, 827 (C.D. Ill. 2014). Given these divergent inferences, a reasonable jury could find Warner concealed evidence from the prosecutor.

¶ 111    That determination, however, does not end the commencement-or-continuance inquiry— we must consider whether a genuine issue of material fact exists on the question of whether, interpreting the facts in the light most favorable to plaintiff, Warner's suppression of the incomplete polygraph was the proximate cause of the commencement or continuation of the prosecution. Before undertaking this analysis, we note consideration of the incomplete polygraph report by the supreme court in *Beaman*, 229 Ill. 2d 56, and the federal district court in *Beaman*, 7 F. Supp. 3d 805, was undertaken to review the nondisclosure of that result *to plaintiff*. In those cases, in addition to the incomplete polygraph examination, it is clear the prosecutor or State did not reveal to plaintiff the following: (1) Murray "was charged with domestic battery and possession of marijuana with intent to deliver prior to [plaintiff's] trial"; (2) Murray "physically abused his girlfriend on numerous prior occasions"; (3) Murray used steroids, causing him to behave erratically; and (4) the prosecution evaluated Murray as a

potential suspect. *Beaman*, 229 Ill. 2d at 67, 74. Here, except for the incomplete polygraph examination, the prosecutor was already aware of these facts. We consider the effect on the nondisclosure of the incomplete report alone on the prosecutor.

¶ 112    Plaintiff argues the polygraph report was exculpatory and material and a reasonable juror could find the disclosure of the report would have changed Souk's opinion on prosecuting plaintiff. In support, plaintiff relies on language from the federal district court's decision in *Beaman*.

¶ 113    We acknowledge the federal district court, for the purposes of analyzing plaintiff's claim Warner committed a *Brady* violation by not turning over exculpatory evidence to the prosecutor, found "evidence relating to Murray" "exculpatory" in that "it inculpates someone else." *Beaman*, 7 F. Supp. 3d at 823. However, what is not clear is if the district court would have done so if the polygraph report stood alone. In the very next sentence after the federal district court found all Murray evidence "exculpatory," the court refers to such evidence as "not strong evidence," but "*taken together*, Murray's erratic behavior from steroids, history of domestic assault including elbowing his girlfriend in the chest, and possible evasion during the polygraph *** suggest he could have been the culprit." (Emphasis added.) *Id.* Moreover, in finding the evidence of the polygraph report material, the district court found it material only when considered with the other information related to Murray:

> "Armed with Murray's documented drug abuse, domestic assault with possibly similar patterns, and erratic behavior from steroids, as well as a polygraph that Murray did not complete and the plausible inference that it was an intentional evasion, the evidence pointing to Murray *may well have* overcome the showing required for the trial judge to allow Plaintiff to argue another culprit, namely Murray, committed the murder." (Emphasis added.) *Id.* at 825.

Plaintiff cites language appearing in the case as proof the district court found the polygraph report standing alone to be material and exculpatory: "Plaintiff has provided sufficient evidence of a violation of his constitutional rights for the failure to disclose the Murray polygraph to the prosecution. *** Plaintiff has shown facts that make out a violation of his due[-]process right to the disclosure of material exculpatory evidence." *Id.* at 830. We have reread the case. The summary provided by the district court follows analysis of the polygraph report only in conjunction with the other Murray evidence. See *id.* at 823. At no point in its analysis did the district court analyze the polygraph report separate and apart from the other Murray evidence in deciding it to be exculpatory and material.

¶ 114    Similarly, the Illinois Supreme Court did not evaluate the polygraph report separate from the other Murray evidence. The Illinois Supreme Court plainly found the failure to disclose all information related to Murray material, which included the incomplete polygraph examination, the domestic-battery and drug charges, the prior physical abuse of his girlfriend, and his use of steroids and erratic behavior. *Beaman*, 229 Ill. 2d at 58-59, 74-75.

¶ 115    The undisputed facts of this case show the prosecution already knew Murray was a suspect and a potential liar when the decision was made to commence and continue the case. During the prosecution, Souk knew Murray and Lockmiller had been involved sexually. Souk knew Murray made two differing statements about the time he left town, meaning Murray potentially lied and Murray was in town and had no alibi when Lockmiller was murdered. Souk knew Murray had been charged with domestic violence, and there was evidence Murray physically abused his girlfriend multiple times. Souk knew of Murray's steroid abuse. Souk knew Murray

had been charged with possession of marijuana with intent to deliver. He knew Murray was Lockmiller's drug dealer and Lockmiller owed him money. Souk was informed of Murray's character and Murray's opportunity to murder Lockmiller.

¶ 116    According to the undisputed facts, the polygraph report adds little if anything to the prosecution's existing knowledge of Murray. The incomplete report does not establish a motive to murder Lockmiller or establish Murray to be the killer. The polygraph report, standing alone, indicates only that the test was incomplete due to Murray's failure to follow instructions or, at best, with an inference in plaintiff's favor, Murray intentionally avoided completing it. To find a genuine issue of material fact on the matter of proximate cause, we would have to extend the reasonable inference that Murray intentionally avoided completing the polygraph to another inference—such information would have persuaded Souk to not charge or prosecute plaintiff. Given all that Souk indisputably knew about Murray, that inference is not reasonable. In these circumstances, arising from undisputed facts and reasonable inferences therefrom, a jury could not reasonably find Warner's nondisclosure of the polygraph report, whether intentional or not, a proximate cause of the plaintiff's prosecution.

¶ 117    Our decision is not undermined by plaintiff's emphasis on Souk's admission, had he known about the report, he would have asked questions about it. When Souk was asked if it would have changed his mind if the polygrapher opined Murray manipulated the polygraph, Souk did not respond it would have: "Well, I think that was fairly early in the investigation. I would have asked some questions and looked at it more."

¶ 118    As the Seventh Circuit Court of Appeals concluded when it rejected plaintiff's attempt to find the police officers liable due to the prosecutor's failure to disclose *Brady* material by simply alleging the police and prosecutor agreed the prosecutor would not disclose the evidence, "[i]t is clear that Beaman's primary quarrel is with Souk." *Beaman*, 776 F.3d at 512. Summary judgment in Warner's favor is proper.

¶ 119                              c. *Defendant Zayas*

¶ 120    Plaintiff made three allegations regarding Zayas's role leading to his prosecution: (1) Zayas participated in the May 1994 meeting during which the decision was made to prosecute plaintiff, (2) Zayas supervised the detectives who worked on the case, and (3) Zayas allowed the arrest to occur knowing the "case was half-baked." Plaintiff, however, points to no evidence from which a jury could conclude Zayas commenced or continued the criminal suit against him. There is no evidence Zayas pressured or exerted influence over Reynard's and Souk's decision to prosecute and no evidence of any false statements by Zayas to the prosecutor. There is no evidence showing Zayas concealed information or engaged in wrongful or bad-faith conduct. Because plaintiff cannot establish the first element of his malicious-prosecution claim, Zayas is entitled to summary judgment.

¶ 121                    C. Intentional Infliction of Emotional Distress

¶ 122    The trial court held plaintiff's claim of intentional infliction of emotional distress (IIED) was based and contingent upon his malicious-prosecution claims against defendants and granted summary judgment on that claim. In the initial appeal, plaintiff's only challenge to that holding was the conduct in "pursuing plaintiff's conviction maliciously, disregarding and manipulating the evidence, and sending an innocent man to prison for a dozen years for a crime he could not have committed" constituted extreme and outrageous conduct. We held plaintiff

- 23 -

failed to develop this argument or cite relevant authority and, thereby, forfeited his claim. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016).

¶ 123 On remand, plaintiff asks this court to reconsider its holding. Plaintiff maintains, rather than provide another detailed recitation of the facts underlying the malicious-prosecution claim, he summarized his argument and cited six cases in which Illinois courts allowed IIED claims to proceed on facts related to malicious prosecution.

¶ 124 The fact remains plaintiff's sole argument in his initial brief was one sentence long. Plaintiff did not cite the elements for an IIED claim. Plaintiff did not clarify whether the IIED claim depended upon the viability of his malicious-prosecution claims or whether he sought relief for IIED independent of those claims. Plaintiff simply provided string cites and left the burden on this court to research those cases and to surmise his position. Issues that are ill-defined and insufficiently presented do not satisfy the requirements of Rule 341(h)(7). *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855, 869 N.E.2d 964, 979 (2007). Plaintiff has forfeited this claim.

¶ 125 D. Conspiracy

¶ 126 The elements of a civil-conspiracy claim are as follows: (1) a combination of two or more individuals, (2) for the purpose of accomplishing by concerted action an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). The tortious or unlawful act alleged is defendants' alleged malicious prosecution of plaintiff. Because we have found defendants Freesmeyer, Warner, and Zayas are entitled to summary judgment on plaintiff's malicious-prosecution claims, plaintiff cannot establish the third element of his civil-conspiracy claim. We affirm the trial court's order granting summary judgment to defendants on plaintiff's cause of action for conspiracy.

¶ 127 E. *Respondeat Superior* and Indemnification Claims

¶ 128 Plaintiff, on appeal, acknowledges the *respondeat superior* and indemnification claims are dependent on the claims against the individual defendants. Given our findings summary judgment was properly granted on the individual claims, we conclude the trial court properly granted summary judgment on the *respondeat superior* and indemnification claims.

¶ 129 III. CONCLUSION

¶ 130 We affirm the trial court's judgment.

¶ 131 Affirmed.